**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JOHN KNIGHT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 04 12698 JLT** |
| | ) | |
| CHRISTMAS TREE SHOPS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CHRISTMAS TREE SHOPS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rules 56.1 and 7.1, and in accordance with this Court's Orders of February 7, 2006 and May 2, 2006, defendant Christmas Tree Shops, Inc. ("CTS") has moved to dismiss all remaining counts of plaintiffs' Amended Complaint, and respectfully submits this supporting Memorandum and accompanying Consolidated Statement of Facts and Appendix of Exhibits.[1]

## SUMMARY OF THE ARGUMENT

Though they began this case by alleging RICO conspiracy, copyright violation and trade dress infringement by CTS, plaintiffs' facts speak only of rightful competition by CTS, through its imitation of product features which the law not only permits but encourages. As a result, plaintiffs' RICO and copyright claims have been dismissed, and now their trade dress and unfair competition counts must fail because, on the undisputed facts, plaintiffs cannot establish either: (1) that their products *have* any protectible trade dress, i.e., features whose primary purpose is to *identify the plaintiffs as the source of their products*, rather than to simply be desirable or

---

[1] All cites in this Memorandum to "SOF ¶_" are to the Consolidated Statement of Facts. Selected deposition excerpts and documents produced by the parties in this case are attached hereto for the Court's convenience, and are referenced as "Ex. _". These exhibits are also attached to the Affidavit of Carrie Kei Heim, filed herewith.

marketable; or (2) that CTS infringed any protectible rights by creating a *likelihood of confusion among consumers as to the source* of its alleged "copies." See Publications Int'l Ltd. v. Landoll, Inc., 164 F.3d 337, 343 (7th Cir. 1998) (Posner, CJ.) ("[T]rademark and trade dress law *do not protect originality; they protect signifiers of source*.") (emphasis added); Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 769 (1986) ("[T]he gravamen of an unfair competition claim is the *likelihood of consumer confusion as to the source* of the goods or services.") (emphasis added).

<u>**SUMMARY OF UNDISPUTED FACTS**</u>

I.    **Glass Eye and the Sconces**

Plaintiffs John Knight and Donna Russell Knight d/b/a The Glass Eye Gallery (collectively "Glass Eye") have been in the business of making glass creations for 35 years. See SOF ¶1. Glass Eye owns a combination residence and gallery on Cape Cod, with approximately 1,000 feet of selling space. SOF ¶2. This gallery sells blown and stained glass, pottery, and other crafts made by American artisans. SOF ¶3. Glass Eye only sells locally handcrafted products, for discriminating shoppers. SOF ¶¶3, 20. All stained glass items sold at the gallery are designed and made by Glass Eye. SOF ¶3.

In 1992, Glass Eye began designing, making and selling versions of an opalescent glass wall sconce intended to hold dried flowers. SOF ¶4. The sconce was never included in any Glass Eye advertising or otherwise publicly promoted. SOF ¶28. More than one thousand Glass Eye sconces were sold at the gallery from 2001 to 2003. SOF ¶10. Glass Eye sold the sconce at a full retail price of $32.95 until its discontinuation in early May of 2003. SOF ¶¶11-12.

CTS has close to 30 stores, each as big as 50,000 feet, located primarily in the New England area. SOF ¶13. CTS carries a great range of merchandise, emphasizing bargain sales,

and buys thousands of items, often from vendors in China.  Id.  The CTS sconce sold for $1.99 in 2003, and was reduced to $1.00 in 2004.  SOF ¶14.  It was made in China, and the label clearly stated "Made in China" alongside the CTS name and "sleigh" logo.  SOF ¶15.  CTS sent the Glass Eye sconce to a vendor in China as a sample, but never instructed the manufacturer to copy the item directly.  SOF ¶16.  CTS later chose the colors for the CTS sconce based on its buyer's personal preferences.  Id.

The CTS sconce is inferior to the Glass Eye sconce in craftsmanship and appearance. SOF ¶18.  The Glass Eye sconce is solid, framed in copper that has an almost black color, has superior soldering and seaming with nice quality glass and is more delicate.  Id.  The CTS sconce does not have the look of being handmade, is not solid, has inferior construction that can be pulled apart, is framed in a more square textured soft lead with a light gray color, is thinner, and has a ribbon hanger.  Id.

## II.     Country Glass and the Sun Catchers

Plaintiffs Charles Cole, Viiu Niiler and Country Glass Shop (collectively, "Country Glass") have designed, manufactured and sold glassworks from their Vermont factory for 30 years.  SOF ¶31.  Located in a 150 year old farmhouse on a back road, the Country Glass retail store is open during the summer for 16 weeks out of every year.  SOF ¶32.  Country Glass also sells its creations to specialty retailers, some of whom have been Country Glass customers for decades.  SOF ¶33.  Country Glass customers appreciate American crafts and the handmade quality of Country Glass products.  Id.

In 1998, Country Glass designed, made and sold a cobalt blue sun catcher bearing an image of a "Nantucket basket" filled with hydrangeas.  SOF ¶34.  The hydrangea design was chosen at the request of a retail customer, Judi Hill, who operates Hill's Gallery in Nantucket,

and 90% of all Country Glass sun catchers bearing this design were sold at Hill's Gallery.  SOF ¶¶37, 39.  The remaining sun catchers were sold at other specialty retail stores, including The Glass Eye Gallery, and at Country Glass' own retail store.  SOF ¶40.  The sun catcher was also produced in a number of other colors, none of which were as popular as the cobalt blue, which is a standard color in the glass industry.  SOF ¶35.  The sun catcher retails for $18 to $25, and was never featured in any Country Glass advertising.  SOF ¶¶41, 50.

The CTS sun catcher sold in 2003 and 2004 for $1.69.  SOF ¶42.  It was also made in China, as the label clearly stated, alongside the CTS name and "sleigh" logo.  SOF ¶43.  CTS sent the Country Glass sun catcher to a vendor in China as a sample, and requested that the CTS sun catcher be made with two holes for hanging, but it was produced with only one.  SOF ¶44.

The Country Glass sun catcher is a lighter color, with rounder pieces of glass forming the basket image and smoother glass leaves, an oval shape and flowing edge.  SOF ¶45.  The CTS sun catcher is darker, full of bubbles, more rigid and flat with no flow, has a different weave to the basket, an "orange peel" quality to the glass and a leather strap for hanging.  Id.

## III.    Aunt Sadie's and the Candles

For the last eight years, plaintiff Aunt Sadie's, Inc. ("Aunt Sadie's") has owned and operated a candle factory in Boston, where it manufactures "candles in a can."  SOF ¶52.  Aunt Sadie's has sold its candles at its retail store in Boston for the last 5 ½ years, and has also sold its candles nationwide through website and other retail stores, and has recently opened a store in Denver.  SOF ¶53.  Aunt Sadie's candles retail for $15, and Aunt Sadie's customers are keen on scents, and seek out realistic or true-to-life fragrances.  SOF ¶¶58, 65.

Aunt Sadie's began selling "Apple Pie" candles in 2001, "Happy Birthday" candles in 2002, and "It's a Boy" and "It's a Girl" candles in 2003.  SOF ¶56.  None of these candles was

ever featured in Aunt Sadie's advertising or other print promotion. SOF ¶70. These candles all bear the Aunt Sadie's name somewhere on the label. SOF ¶69. The name "Aunt Sadie's" and the catchphrase "candles in a can" are trademarked. SOF ¶57.

CTS sold 8-ounce candle tins with labels stating "Happy Birthday to You," "It's a Boy," and "It's a Girl" in 2005 for $1.99. SOF ¶59. They were made in China, and the labels clearly stated this, alongside the CTS name and "sleigh" logo. SOF ¶60. The labels for the CTS candles were chosen based on the success of other CTS birthday- and baby-related items, and the art work was then sent to the manufacturer in China. SOF ¶61. The size of the candle was determined by what was available at the factory in China. Id.

Unlike the CTS candles, the Aunt Sadie's candles are highly scented with fragrances such as apple pie, baby powder, and piña colada. SOF ¶63. The Aunt Sadie's "Happy Birthday" label is decorated with yellow stripes and blue stars, the "Apple Pie" candle has an apple design, and the "It's a Boy" and "It's a Girl" labels are each decorated with a flower image with a button at the center. Id. The CTS candles have no scent, and use a lower quality paper label. SOF ¶64. The CTS "Happy Birthday to You" label is decorated with cupcakes, balloons, confetti, and the words "Make a Wish," the CTS "It's a Girl" candle sports an image of alphabet blocks, and the CTS "It's a Boy" candle has a baby rattle design. Id. There is no CTS "Apple Pie" candle.

## IV.    Boerman and the "It's Great to Create" Plaques

Plaintiff Susan Boerman ("Boerman") authored a 29-page book titled, "It's Great to Create," which contained instructions on how to make a number of craft items, including two wooden plaques called "Frosty's Snow Cones" and "Autumn Harvest." SOF ¶71. Four pages from Boerman's book contain drawings of these plaques. SOF ¶72.

CTS sold its allegedly infringing "fall painted plaque" for $3.99 each in 2003 and 2004,

and sold its allegedly infringing "painted Xmas hanger" for $1.99 each in 2003.  SOF ¶73.  CTS

did not design any of the plaques, but instead chose the ready-made products directly from a

wholesaler's showroom in China.  SOF ¶74.  The plaques were sold with the CTS label bearing

the red "sleigh" and stating that the items were made in China.  SOF ¶75.

## ARGUMENT

Plaintiffs' claims of copyright violation and racketeering were dismissed for failure to

state a claim upon which relief could be granted.  See Order of August 2, 2005.  Only plaintiffs'

claims of trade dress violation and unfair competition remain, along with their request for

declaratory and injunctive relief.  See Amended Complaint at Sections V-VI, X (First, Second

and Sixth Causes of Action).  "The standard for summary judgment in this circuit is well

known…  The moving party is entitled to judgment as a matter of law if the nonmoving party

does not adduce enough evidence to permit a reasonable trier of fact to find for the nonmoving

party on *any element* essential to its claim."  Smith Barney, Harris Upham & Co. v. Connolly,

887 F.Supp. 337, 341 (D. Mass. 1994) (Tauro, CJ.) (emphasis added); see also Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986).

## I.    Plaintiffs' Claimed Trade Dresses Are Not Protectible

The Lanham Act protects a product against a competitor's use of "any word, term, name,

symbol, or device," but only where such use "is likely to cause confusion, or to cause mistake, or

to deceive" as to the source or origin of that product.  15 U.S.C. §1125(a).  This protection thus

extends to a product's "trade dress," defined as "the design and appearance of a product together

with the elements making up the overall image", but only to the extent that such dress "serves to

identify a particular source."  Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 37-38

(1st Cir. 2001) (internal quotations omitted).  It follows, then, that those features of a product not

protected as trade dress may indeed be imitated.

"Trade dress protection must subsist with the recognition that *in many instances there is no prohibition against copying goods and products*.  In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying."  TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 29 (2001) (emphasis added); see also Abercrombie & Fitch, 280 F.3d 619, 630 (6th Cir. 2002) ("[A]ny 'thing' that dresses a good can constitute trade dress.  Protectibility is another matter.").  Accordingly, for plaintiffs' products to be protected under the Lanham Act, plaintiffs must prove that the claimed trade dresses are: "(i) used in commerce, (ii) non-functional, and (iii) distinctive."  Yankee Candle, 259 F.3d at 38 (citing I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998)).  On the undisputed record, each of plaintiffs' products fails to meet one or more of these requirements.

### A.  Plaintiffs' Trade Dresses Are Not Distinctive Enough To Have Acquired "Secondary Meaning"

A trade dress has acquired requisite distinctiveness "if it has *developed secondary meaning*, which occurs when, in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself."  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211 (2000) (citing Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982)) (emphasis added); Yankee Candle, 259 F.3d at 38, 43 n.14 ("[S]econdary meaning occurs when 'the primary significance [of the trade dress] in the minds of the consuming public *is not the product but the producer*.'") (quoting I.P. Lund, 163 F.3d at 42) (emphasis added).

In all cases, "[p]roof of secondary meaning entails vigorous requirements" and "it is the party seeking protection… who bears the burden of proving that secondary meaning has attached."  Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993).  But

that burden is especially formidable here, because plaintiffs have sought protection for the

alleged trade dresses of various product designs.  See Amended Complaint at ¶¶20-23

("Plaintiffs' *products* have secondary meaning.") (emphasis added).  Product design or

configuration -- unlike words, labels or packaging -- can never be "inherently" distinctive, as the

United States Supreme Court has explained:

> In the case of product design… we think consumer predisposition to equate the feature
> with the source does not exist.  Consumers are aware of the reality that, almost
> invariably, *even the most unusual of product designs* -- such as a cocktail shaker shaped
> like a penguin -- *is intended not to identify the source, but to render the product itself
> more useful or more appealing*.

Wal-Mart, 529 U.S. at 213 (concluding that inherent distinctiveness should not be available in

product design cases because "[c]onsumers should not be deprived of the benefits of competition

with regard to the utilitarian and aesthetic purposes that product design ordinarily serves")

(emphasis added). [2]

Thus, to prevail, plaintiffs must prove that their designs have *acquired* distinctiveness in

the form of secondary meaning, such that "the *primary* significance" of each product design is to

identify the relevant plaintiff as its source, not simply to be an appealing or marketable product.

I.P. Lund, 163 F.3d at 41-42 ("[W]e reject any lesser test.") (emphasis added).  As set forth in

detail below, however, plaintiffs' trade dress claims fail because plaintiffs have offered *no* direct

evidence probative of secondary meaning, and the undisputed circumstantial evidence in fact

reveals a *lack* of any connection by consumers between the products at issue and the plaintiffs as

their source.

---

[2] As a general principle, distinctiveness may be either "inherent" or "acquired."  A trade dress "is inherently
distinctive if its intrinsic nature serves to identify a particular source."  Wal-Mart, 529 U.S. at 210 (citing Two
Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)); Yankee Candle, 259 F.3d at 38.  "To the extent that
there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as
product design, thereby requiring secondary meaning."  Wal-Mart, 529 U.S. at 215; Yankee Candle, 259 F.3d at 41.

1.    **Plaintiffs Have Presented No Direct Evidence of Secondary Meaning**

"[C]onsumer surveys and testimony are the only direct evidence" of secondary meaning.
<u>Boston Beer</u>, 9 F.3d at 182.  Surveys in particular are the "preferred manner of demonstrating
secondary meaning."  <u>Yankee Candle</u>, 259 F.3d at 39.  In response, three plaintiffs have
produced no survey evidence, one produced an incompetent survey, and *none* has produced
probative consumer testimony.

a.    **Glass Eye's Survey was Methodologically Unsound and Did
Not Even *Attempt* to Show Secondary Meaning**

Glass Eye is the only plaintiff to proffer survey evidence in support of its claims of trade
dress violation, but for the reasons detailed in <u>CTS's Motion to Strike</u> (filed herewith), that
survey was so irredeemably flawed that it must be excluded from consideration by this Court.
Even if that survey had been validly conducted, however, it wrongly addressed the issue of
consumer confusion rather than that of secondary meaning.  This misplaced focus "places the
cart before the Clydesdale."  <u>Boston Beer</u>, 9 F.3d at183 (rejecting the argument that "because the
survey demonstrates a likelihood of consumer confusion… secondary meaning must exist.").
Where a plaintiff's product has "not attained secondary meaning… [the] court [does] not need to
address the question of likelihood of confusion."  <u>Id.</u>

Very briefly, Glass Eye's surveys were mailed exclusively to Glass Eye customers.  <u>See
CTS's Motion to Strike</u> Ex. C.  It asked survey participants if they were "familiar with The Glass
Eye wall sconce", and then asked if they had "seen a similar looking sconce in The Christmas
Tree Shop."  <u>Id.</u> at Ex. B.  But rather than polling a neutral survey universe, presenting *all*
participants with an image of the Glass Eye wall sconce and asking the central question, "*Do you
associate this product with any single source?*," the Glass Eye survey sought *only* the responses
of *existing* Glass Eye customers and asked *no* questions designed to "show that, in the minds of

the public, the *primary* significance of [the wall sconce] is to identify the source of the product rather than the product itself." I.P. Lund, 163 F.3d at 41-42 (emphasis added). Accordingly, the Glass Eye survey, even if it had been methodologically sound, neither sought nor provided any support for a finding of secondary meaning.

> **b.    Plaintiffs' Consumer "Testimony" Provides No Evidence of Secondary Meaning**

Plaintiffs Country Glass and Boerman have adduced no consumer testimony at all. As for plaintiffs Glass Eye and Aunt Sadie's, their consumer "testimony" has been limited to isolated conversations they claim to have had with customers regarding CTS's allegedly infringing products, but as with the Glass Eye survey, each such anecdote was on the subject of *confusion*, not secondary meaning.[3] Indeed, Glass Eye admitted that no customer ever spoke about the allegedly identifying features of the Glass Eye Sconce. SOF ¶9. And the only documentary evidence of consumer "testimony" in the record is a note from a store owner who buys from Aunt Sadie's, stating simply that, at her store, "We are fans of your [Aunt Sadie's] creative candles…" SOF ¶67. Standing alone, that note proves nothing of how any claimed trade dress elements identify Aunt Sadie's as the source of any product -- indeed, the note does not even reveal *which* of Aunt Sadie's hundreds of candle designs the writer is a "fan of." Instead, the note suggests only the customer's appreciation for the products themselves, and thus proves nothing on the question of secondary meaning. See Wal-Mart, 529 U.S. at 213 ("[A]lmost invariably, even the most unusual of product designs… is intended… to render the product itself more useful or more appealing").

> **2.    The Undisputed Circumstantial Evidence Establishes That the Products at Issue Did *Not* Acquire Secondary Meaning**

"Secondary meaning may also be proven through circumstantial evidence, specifically

---

[3] These anecdotes are examined in greater detail infra at Section II(D).

the length and manner of the use of the trade dress, the nature and extent of advertising and

promotion of the trade dress, and the efforts made to promote a conscious connection by the

public between the trade dress and the product's source."  Yankee Candle, 259 F.3d at 39 (citing

Boston Beer, 9 F.3d at 182).  "Other factors may include the product's 'established place in the

market' and proof of intentional copying."  Id. at 44 (citing I.P. Lund, 163 F.3d at 42).  On each

of these factors, the undisputed evidence precludes any finding of secondary meaning for the

Glass Eye, Country Glass, and Aunt Sadie's plaintiffs.  (Plaintiff Boerman's claims fail for

additional reasons explained infra at Part B.)

Addressing these factors in order, we first turn to plaintiffs' length and manner of use of

the alleged trade dresses.  The Aunt Sadie's candles at issue were sold in the marketplace for less

than five years; the Country Glass sun catcher for eight years; and versions of the Glass Eye wall

sconce were sold for approximately 11 years.  See SOF ¶¶4, 34, 56; cf. Duraco, 40 F.3d at 1454

(stating that five years is "not so long a time as to raise a strong inference of consumer

association with a single source"); Straumann Co. v. Lifecore Biomedical Inc., 278 F.Supp.2d

130, 139 (D. Mass. 2003) (use of trademark for nine and a half years "standing alone… is

insufficient to establish secondary meaning").  Beyond these relatively short lengths of use of the

alleged trade dresses, Aunt Sadie's has an even greater burden given the particular "manner" in

which its alleged dress was used -- throughout, the "Aunt Sadie's"  name was displayed on each

of the four candles at issue in this case.  SOF ¶69; cf. Maple Grove Farms v. Euro-Can Prods.,

Inc., 974 F.Supp. 85, 94 (D. Mass. 1997) (where the plaintiff's brand name was featured on

maple syrup jugs, the jugs were "promoting not the design elements that are the focus of this

suit, but the words 'maple grove farms'…  When words are used, there is even a higher burden

to prove secondary meaning") (citing Ohio Art Co. v. Lewis Galoob Toys, Inc., 799 F.Supp. 870,

883 (N.D.Ill.1992)).

More pivotal, however, is the fact that the plaintiffs have produced *no* evidence that any of the claimed trade dresses were *ever* advertised or promoted *in any way*. See SOF ¶¶28, 50, 70. "Advertising and marketing expenses are truly probative of secondary meaning only when they encourage consumers to make the connection between a product feature and the origin of the product". Straumann, 278 F.Supp.2d at 139 (finding that even $12.1 million in advertising was still not probative because there was "no evidence of so-called 'look for' advertising . . . that encourages consumers to look for particular features as indicative of origin"); see also Yankee Candle, 259 F.3d at 44 ("To be probative of secondary meaning, the advertising must *direct the consumer to those features claimed as trade dress*. Merely 'featuring' the relevant aspect of the product in advertising" is insufficient) (emphasis added).  Here, plaintiffs have offered no evidence that they ever featured any of the products at issue in a single ad -- a failure that courts in this Circuit have deemed fatal to purported claims of secondary meaning. See Yankee Candle Co. v. Bridgewater Candle Co., 99 F.Supp.2d 140, 155 (D. Mass. 2000) ("Yankee I") ("Yankee has produced nothing to show that the high sales figures and extensive advertising accomplished anything more than simple promotion of an aesthetic product."); Yankee Candle, 259 F.3d at 44 ("We believe the district court emphasized the relevant issues in conducting its analysis of secondary meaning" when it required "evidence demonstrating a conscious connection by the public between the claimed trade dress and the product's source… To find otherwise would provide trade dress protection for any successful product").

In the absence of any evidence that plaintiffs tried to promote conscious connections between their claimed trade dresses and themselves as their respective product's sources, any evidence of copying -- assuming *arguendo* plaintiffs could prove any intent by CTS to copy -- is

of "negligible" import.  "Intent to copy plays a negligible role in a product design case, because 'the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product.'"  Straumann, 278 F.Supp.2d at 139-40 (evidence of intentional copying did not "add[] any real weight" to plaintiff's case) (quoting Duraco, 40 F.3d at 1453) (internal citations omitted); Yankee Candle, 259 F.3d at 45 ("We also do not find Yankee's evidence of intentional copying probative of secondary meaning… *intent plays a particularly minor role* in product design/configuration cases.") (emphasis added). Moreover, the undisputed evidence establishes that CTS's intent in designing and choosing its products was to create pleasing and marketable products, not to confuse consumers as to its products' source.[4]  Accordingly, CTS's alleged intent is not probative of secondary meaning.  Cf. Duraco, 40 F.3d at 1453 ("[T]he evidence indicates without contradiction that Joy emulated Duraco's design *because Joy believed it to be a superior one, not to trade on Duraco's non-existent good will*") (emphasis added).

Finally, beyond plaintiffs' failure to show any consumer association between the claimed trade dresses and the plaintiffs as their sources, Glass Eye has admitted to the *absence* of such an association, conceding that its product has not acquired the secondary meaning necessary to qualify for trade dress protection.  At its Rule 30(b)(6) deposition, Glass Eye admitted that, unless a person were already an educated Glass Eye customer who had previously seen the wall sconce in Glass Eye's store, *none* of the trade dress elements alleged by plaintiffs would be recognizable as an indicator of source:

> Q.  Is there any one of the characteristics that you have listed in Paragraph 20 [of the Amended Complaint] that would suggest to one of those people [the uneducated consuming public] that a sconce like Exhibit 5 is a creation of John Knight?

---

[4] Evidence of CTS's alleged intent to copy is discussed at Section II(E), infra, and there is *no* evidence of any intentional copying of the Boerman product or product design.  To the contrary, the alleged Boerman imitation was purchased as-is by CTS from a wholesaler's shelf in China.  See SOF ¶74.

A. Not unless they have been in my gallery… Or received one as a gift or seen one in someone's home.

Q. When you say "seen one in someone's home," you mean where it was identified as your piece?

A. Yes.

Ex. 1 at p.76, l.21-p.77, l.7; see also SOF ¶8.  Country Glass similarly admitted that a central feature of its sun catcher, its color, was an industry standard, and that "Country Glass cannot make a claim to owning… cobalt blue."  Ex. 2 at p.46, ll.12-21; see also SOF ¶35.

In sum, plaintiffs' products were on the market for a relatively short period of time, plaintiffs did not advertise these products or make any attempt to promote a connection between the products at issue and the plaintiffs as their source, and CTS had no intent to confuse consumers as to the source of the CTS products.  "Proof of secondary meaning requires at least *some* evidence that consumers associate the trade dress with the source."  Yankee Candle, 259 F.3d at 44 (emphasis in original).  It is beyond dispute that none of plaintiffs' products at issue is primarily an indicator of source.  These products therefore are not protectible under trade dress law, and plaintiffs have fallen far short of the "vigorous" evidentiary showing required to survive summary judgment.  See Boston Beer, 9 F.3d at 181.

**B.    Boerman's Alleged Trade Dress Is Not Protectible Because, As Alleged, the Products at Issue Were Not "Used in Commerce"**

Boerman's trade dress claims have been pled so deficiently that the above-discussed issue of secondary meaning need not even be reached to enter summary judgment in favor of CTS.  Boerman inconsistently argues that her *book*, It's Great to Create, is the item whose trade dress has been infringed, but that the elements comprising the alleged trade dress are contained in her *plaques* which are drawn and photographed within that book.  See Amended Complaint at ¶14

and ¶22.  This disconnect between the product alleged to have been infringed and the products alleged to have a protectible trade dress is fatal to Boerman's claims.

Evaluation of trade dress is based on total overall impression of the product, not of its individual features.  This, however, "does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress."  See Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 381 (2d Cir. 1997) .  To the extent that the product Boerman seeks to protect is her book, she has failed entirely to plead any allegedly protectible elements which comprise the *book's* trade dress.  Amended Complaint at ¶22 (describing only the characteristics of "Susan Boerman's *plaques*") (emphasis added);[5] compare, e.g., Harlequin Enters. Ltd. v. Gulf & Western Corp., 644 F.2d 946, 949 (2d Cir. 1981) (listing the elements of the Harlequin books that were claimed to be infringed by a competitor's "substantially similar" books, including the books' dimensions, various cover design elements, retail price, use of gold filigree, style in which the book titles were printed, and the books' editorial content).

Finally, to the extent that Boerman claims that elements of the depicted plaque themselves are protectible trade dress, her claims fail the threshold requirement that the products at issue be "used in commerce."  Yankee Candle, 259 F.3d at 38.  Boerman has not alleged that she ever commercially manufactured plaques based on the designs in her book, or that she ever sold even one such plaque.  Accordingly, any alleged trade dress that might be attributed to

---

[5] Boerman cannot resuscitate these alleged trade dress elements by attempting to attribute them to the *pages of the book* describing the plaques, rather that to the plaques themselves.  "Trade dress" has been consistently defined to mean "the elements making up the *overall image* that serves to identify the product presented to the consumer." Yankee Candle, 259 F.3d at 37 (emphasis added).  The plaques depicted in the book are described, drawn, and photographed on a few pages in the second half of a 29-page crafts book.  SOF ¶¶71-72.  These selected products buried within the greater whole cannot be deemed to represent the "total overall impression" of the book, and accordingly, there can be no trade dress protection given to Boerman's book based on the content of those few pages.  Boerman's claims of copyright infringement relating to the book were dismissed for failure to state a claim pursuant to the Court's Order of August 2, 2005.

Boerman's plaques has not been "used in commerce," and is not protectible.[6]

 **C.** **Two Plaintiffs' Alleged Trade Dresses Are Not Protectible Because They Are "Functional"**

"To be protected under the Lanham Act, a… trade dress must not be functional." <u>I.P. Lund</u>, 163 F.3d at 36 (citing <u>Two Pesos</u>, 505 U.S. at 775). "If the trade dress is functional, it receives no protection under trademark law… '[This] doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.'" <u>Id.</u> (quoting <u>Qualitex Co. v. Jacobson Prods Co.</u>, 514 U.S. 159, 164 (1995)). "[A] functional product feature is one that 'is essential to the use or purpose of the article or [that]… affects the cost or quality of the article.'" <u>Id.</u> (quoting <u>Inwood Labs.</u>, 456 U.S. at 851 n.10). Finally, "the party alleging trademark infringement… bears the burden of proving non-functionality of those elements of the physical object that the plaintiff claims constitute the mark and for which the plaintiff is seeking protection." <u>Id.</u> Two plaintiffs here cannot meet that burden.

 Measured by this definition, the round tin can for which Aunt Sadie's seeks trade dress protection is the quintessence of "functional." Such was the Appeals Court's logic when it denied protection to a similarly "prosaic" cylindrical soda can eight inches high and seven inches in diameter:

> Functional, as opposed to arbitrary or merely decorative, shapes are not subject to appropriation by one manufacturer. There can be little doubt that Keebler's can is a functional design… *Were this not our holding, the first user of a container such as the now-standard soup can, potato chip bag, or cracker box would be able to preclude competitors from using these highly functional containers.*

<u>See</u> <u>Keebler Co. v. Rovira Biscuit Corp.</u>, 624 F.2d 366, 378 (1st Cir. 1980) (internal citations

---

[6] As noted <u>supra</u> at Section I(A), Boerman's claims can also be dismissed for failure to provide any evidence that either her book or her plaques acquired secondary meaning. <u>See</u> <u>Boston Beer</u>, 9 F.3d at 181 ("[I]t is the party seeking protection… who bears the burden of proving that secondary meaning has attached.").

omitted; emphasis added). See also American Greetings Corp. v. Dan-Dee Imports, Inc., 807

F.2d 1136, 1142 (3rd Cir. 1986) (plaintiff's placement of graphics on tummies of stuffed teddy

bears was functional because it was most visible and effective position for symbols); SOF ¶55

(size of Aunt Sadie's can allowed for the use of larger graphics on the label).

Similarly, Country Glass admitted that three out of five of the elements for which

Country Glass is seeking trade dress protection in fact serve functional purposes. SOF ¶36 (size

was standard for greater visual impact, single hole at top was for hanging, texture was for greater

light refraction). Where a plaintiff's alleged trade dress elements are functional, they cannot

establish any violation of the Lanham Act even if these elements were imitated by CTS or any

other competitor:

> Plaintiff designed a [product] with several functional innovations. These were
> enthusiastically received in the marketplace. Defendant, in imitating them, is doubtless
> sharing in the market formerly captured by the plaintiff's skill and judgment. *While we
> sympathize with plaintiff's disappointment at losing sales to an imitator, this is a fact of
> business life.*

Fisher Stoves, Inc. v. All Nighter Stoveworks, Inc., 626 F.2d 193, 196 (1st Cir. 1980) (emphasis

added); see also I.P. Lund, 163 F.3d at 39 ("[E]ven if a functional feature has achieved secondary

meaning as an indication of origin, that feature is not protectable under… trade dress law.").

## II.    Even If Plaintiffs' Claimed Trade Dresses Were Protectible, They Have Not Been Infringed Because There Is No Proof of Likelihood of Confusion

"This court has identified eight factors to be weighed in determining likelihood of

confusion: (1) the similarity of the [dress]; (2) the similarity of the goods; (3) the relationship

between the parties' channels of trade; (4) the relationship between the parties' advertising;

(5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's

intent in adopting its [dress]; and (8) the strength of the plaintiff's [dress].... No one factor is

necessarily determinative, but each must be considered." I.P. Lund, 163 F.3d at 43 (quoting

Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir.1989)).  Accordingly, this Court need

not find that all, or even most, of these factors favor CTS to determine on summary judgment

that there is no likelihood of confusion.  See, e.g., Astra Pharm. Prods., Inc. v. Beckman Instr.,

Inc., 718 F.2d 1202, 105-09 (1st Cir. 1983) (concluding that the marks were similar (factor 1)

and plaintiff's mark was strong (factor 8), but that "on the whole, no genuine issue as to the

likelihood of confusion has been shown").  The undisputed evidence, when weighed pursuant to

these factors, demonstrates no likelihood of confusion between plaintiffs' allegedly protected

products and the CTS products, and thus there can be no infringement.  See International Assoc.

of Machinists and Aerospace Workers, v. Winship Green Nursing Center, 103 F.3d 196, 201

(1996) ("IAMAW") ("Applying these [summary judgment] principles, we conclude that the

[plaintiff] bears the burden here of adducing 'significantly probative' evidence tending to show

that an appreciable number of [consumers] were in fact likely to be confused or misled").

(internal citation omitted).

**A.    Factor 1:  No Actionable Similarity of Trade Dress**

Once this Court looks beyond, as it must, the functional can container, the Aunt Sadie's

candles at issue are markedly different in both appearance and scent from the CTS candles.  See

I.P. Lund, 163 F.3d at 39 ("It is… clear that even if a functional feature has achieved secondary

meaning as an indication of origin, that feature is not protectable under trademark or trade dress

law.").  It is a matter of undisputed record evidence that Aunt Sadie's "Happy Birthday," "It's a

Boy" and "It's a Girl" candles have visibly different labels and noticeably different smells when

compared with the CTS candles at issue.  SOF ¶¶63-64.  Specifically, it is undisputed that CTS's

alphabet blocks and baby rattle designs look nothing like Aunt Sadie's button-center flowers.

Id.; Exs. 3-4.  Finally, no CTS candle resembles the Aunt Sadie's "Apple Pie" candle in any way.

As for the Glass Eye and Country Glass products, both of these plaintiffs have conceded from the outset that the relevant CTS products are "inferior in craftsmanship and *appearance*." See Complaint at ¶23; Amended Complaint at ¶28 (emphasis added). And as plaintiffs predicted, discovery has established several visible and tangible differences between the products at issue. The Glass Eye sconce is solid, framed in copper that has an almost black color, has superior soldering and seaming with nice quality glass, and is more delicate, while the CTS sconce does not have the look of being handmade, is not solid, has inferior construction that can be pulled apart, is framed in a more square textured soft lead with a light gray color, is thinner, and has a ribbon hanger. SOF ¶18. The Country Glass sun catcher is a lighter color, with rounder pieces of glass forming the basket image and smoother glass leaves, an oval shape and flowing edge, while the CTS sun catcher is darker, full of bubbles, more rigid and flat with no flow, has a different weave to the basket, an "orange peel" quality to the glass and a leather strap for hanging. SOF ¶45. These differences must be accorded even greater weight where, as here, the relevant group of consumers of plaintiffs' products are undisputedly sophisticated. See Section II(C) infra; Fisher Stoves, 626 F.2d at 194-95 (holding that the differences between products, in the context of being expensive and attracting more "educated" buyers, supported the court's rejection of a likelihood of confusion).

Further, the labeling and packaging of the CTS products are strikingly different from those of the Glass Eye and Country Glass products. See Pignons S.A. v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981) (noting that "the packaging of Polaroid and Pignons cameras differs substantially."). Both the Glass Eye sconces and Country Glass sun catchers were gift-wrapped upon purchase -- the Glass Eye wrap in particular is extremely distinctive -- and their labels emphasize the products' handcrafted quality and American manufacture. SOF ¶¶29-

30, 50-51.  In contrast, the CTS products prominently bear labels featuring the distinctive CTS logo of a red sleigh bearing a Christmas tree, the name "Christmas Tree Shops" written in a distinctive red script font, and the words "Made in China."  SOF ¶¶15, 43, 60, 75.  On these undisputed facts, these plaintiffs cannot demonstrate any likelihood of confusion.

**B.      Factor 2:  No Actionable Similarity of Goods and Services**

Trade dress claims premised on product design frequently involve similar goods because the goods *are* the claimed trade dress.  That does not mean, however, that pivotal differences do not exist between the products at issue.  Here, stark differences in cost and quality alone distinguish the CTS products from plaintiffs' products.  See Pignons, 657 F.2d at 488 (holding that the fact that "Pignon's cameras are substantially more expensive than Polaroid's" was a factor in favor of defendant).  Indeed, plaintiffs' products retailed at prices that ranged from *seven to sixteen times higher* than the CTS "copies."  SOF ¶¶11-12, 14, 41-42, 58-59.[7]

Further, the services provided by CTS are very different from those provided by the plaintiffs.  CTS emphasizes sales of bargain items, often made in China, across a wide range of gift, home décor and other merchandise.  SOF ¶13 .  In contrast, Glass Eye and Country Glass specialize in handcrafted works made by local artisans, and Aunt Sadie's specializes exclusively in locally made candles.  SOF ¶¶3, 31, 33, 52.  These important differences defy a finding of likelihood of confusion.

**C.      Factors 3, 4 and 5:  No Actionable Similarity in Channels of Trade and Advertising or Classes of Prospective Customers[8]**

Plaintiffs' products are sold in completely different stores, at completely different prices,

---

[7] See, e.g., Ex. 1 at p.51, ll.17-23; SOF ¶19. (Glass Eye stated that anyone with common sense who saw the $1.99 price tag on the CTS sconce would know it was a product of inferior craftsmanship).

[8] "Treating these factors together has become somewhat of a pattern in this circuit."  Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 3 n.3 (1st Cir. 1993) (citing Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 818 (1st Cir. 1987) (noting interrelation of factors); Pignons, 657 F.2d at 488 (same)).

than CTS's.  CTS and plaintiffs advertised in different ways, and sought the business of different consumers.  All three of these factors therefore weigh heavily in favor of summary judgment against plaintiffs.

The Glass Eye wall sconce is sold exclusively at the Glass Eye Gallery on Cape Cod, a small, high-end specialty shop.  SOF ¶5.  Similarly, Country Glass sold 90% of its sun catchers through a very small specialty shop on Nantucket Island, and the remainder to retail customers at its gallery and factory in rural Vermont, or through other small specialty shops such as The Glass Eye Gallery.  SOF ¶¶39-40.  Aunt Sadie's candles are sold nationwide, through websites, retail outlets, and at its stores in Boston and Denver.  SOF ¶53.  In contrast to each of these plaintiffs' respective channels of trade, CTS has stores primarily throughout New England, each of which can be as large as 50,000 square feet.  SOF ¶13.  Glass Eye's geographic channel of trade is therefore clearly much narrower than that of CTS, while Aunt Sadie's market is far broader.  The character of their respective channels of trade is also distinct, with CTS sited at expansive bargain outlets, and the plaintiffs operating smaller, more intimate specialty shops.  SOF ¶¶2, 13, 32, 53.   And the undisputed fact that CTS's products sold for as little as one-sixteenth of the price of plaintiffs' products confirms that CTS's and plaintiffs' products are -- in almost every way -- seeking to reach different consumer markets.  SOF ¶¶11-12, 14, 19, 41-42, 58-59.

Although none of the plaintiffs ever featured the products at issue in *any* advertising, Glass Eye consistently advertised its other products as "handcrafted," emphasizing the special method by which the item was made (e.g., with "recycled" or "premium quality glass" or "Tiffany copper foil technique"), and depicting only a single item without reference to price. SOF ¶¶28-29.  Country Glass sold other sun catchers through the Museum of Fine Arts catalog, where they were described as "hand-stamped" by "American artisans," but they were not listed

as being Country Glass products at all, and in one instance were referred to as "our Museum suncatchers." SOF ¶50. Aunt Sadie's promotions in various magazines emphasized signature scents and local manufacture. SOF ¶70. These ads, labels and catalog listings stand in stark contrast to the typical CTS advertising, which highlights bargain pricing ("April Savings," "Don't you just love a bargain?"), features many items within one advertisement, and per the CTS product labels, clearly states that the products are "Made in China." SOF ¶¶13, 15, 43, 60.

Plaintiffs' deposition testimony only reinforces these differences. For example, Aunt Sadie's Rule 30(b)(6) representative testified that its customers are keen on scents and seek out candles with true-to-life fragrances, while the allegedly infringing CTS candles have almost no scent at all. SOF ¶¶63-65. Similarly, the representative for Glass Eye emphasized, in no uncertain terms, that its customers were of a higher caliber than the typical CTS customer, and that Glass Eye does not even target the typical CTS shopper:

> Q. We talked about the profile of the Glass Eye Gallery customer. Does it differ in any way from what you believe the profile is from the typical Christmas Tree Shop customer?
>
> A. I don't want put any discriminatory remarks in concerning what -- of people's customers…. I am trying to be nice…. everyone loves a bargain, and they go to the Christmas Tree Shop. Not everyone comes to the Glass Eye.
>
> Q. …You are after a different customer?
>
> A. Yes…. We are not looking for bargain-hunters. We are not looking for people who are interested in lesser-quality items.

Ex. 1 at p.92, l.8-p.93, l.11; see also SOF ¶20. Finally, the Country Glass representative echoed this same distinction:

> A. …I'm not in touch with the people who buy this [the CTS sun catcher]. These are not the kind of people that come to our shop.
>
> Q. So are you trying to sell your products to the kind of people that you understand to be the typical shopper at Christmas Tree Shops?

A.  No….  We don't have those kind of people coming to our place.

Ex. 2 at p.91, ll.21-23; p.92, ll.4-11; <u>see also</u> SOF ¶46.

A comparison of these facts to those in the <u>Pignons</u> case is instructive.  In <u>Pignons</u>, plaintiff's camera was marketed to a "small, devoted following" and its advertising emphasized the "handcrafted" character of the camera's quality and durability, while defendant's camera was promoted to a more "general audience" and was characterized as easy to use, convenient, and inexpensive.  <u>Pignons</u>, 657 F.2d at 488.  The Court concluded on summary judgment that the higher price of plaintiff's product and the sophistication of its customers supported a finding of *no* likelihood of confusion:

> Those most likely to buy an expensive, sophisticated camera in a specialty camera store are also least likely to be confused by any similarities in Polaroid's and Pignons' marks. *Courts have found less likelihood of confusion where goods are expensive and purchased after careful consideration.*  Sophisticated consumers may be expected to exercise greater care.  Taking the undisputed facts most favorable to Pignons, *we can see no realistic likelihood that the relevant classes of consumers would be confused by the parties' distribution and advertising of their cameras.*

<u>Pignons</u>, 657 F.2d at 488-89 (internal citations omitted) (emphasis added); <u>see also</u> <u>Astra</u>, 718 F.2d at 1206 ("Perhaps the most critical factor that weighs against Astra in our consideration of this issue if the sophistication of the class of prospective purchasers of the subject products.").  On the same rationale, and on the undisputed facts before this Court, these three factors clearly weigh in favor of summary judgment against plaintiffs.

### D.    Factor 6:  No Evidence of Actual Confusion

The undisputed evidence demonstrates that none of plaintiffs' customers was *ever* confused as to source.  Instead, they recognized that the CTS products at issue were inexpensive "Made in China" alternatives to plaintiffs' high-end, hand-crafted creations.  <u>See</u> 1 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 1:28 (4th ed.) ("The successful

competitor offers an identical or equivalent product *at a lower price* or with greater quality.") (emphasis added).

As explained <u>supra</u> at Section I(A)(1)(a), only Glass Eye has offered a survey as direct evidence of actual confusion. That survey is so methodologically unsound that it should not be considered by this Court (<u>see</u> <u>CTS's Motion to Strike</u>), but even its flawed results show no actual confusion. Out of 30 respondents, 19 said they were "familiar" with both the Glass Eye and CTS sconces. <u>See</u> <u>id.</u> Ex. B. Of those 19, only three (16%) reported thinking that Glass Eye had sold its design or sconces to CTS. <u>Id.</u>; <u>cf.</u> <u>Boston Beer</u>, 9 F.3d at 183 n.5 ("Even assuming that appellant's reading of the survey results is the correct one, a positive response rate of 36% is hardly overwhelming."). And most significantly, four survey participants apparently received an alternate version of the Glass Eye questionnaire which gave them the option to state, "I was not confused. The difference in quality was apparent even though the design was similar." <u>CTS's</u> <u>Motion to Strike</u> Ex. B (GE 53-55, 57). *Three out of these four* respondents chose this option, plainly confirming no confusion on their parts. <u>Id.</u> In fact, two other respondents volunteered comments evincing a clear distinction between the sources of the products at issue:

> "My husband and I knew that John Knight did not make the sconces OR would EVER sell his design for manufacture in China!! The design was stolen, I'm sure."

> "No comparison."

<u>Id.</u> Ex. B (GE 56, 66).

Finally, the paltry customer "testimony" that plaintiffs have adduced lends little of substance toward meeting their burden. Country Glass was unable to provide even anecdotal evidence of a single customer who had professed confusion between its product and CTS's. SOF ¶47. Instead, Country Glass admitted that customers who had seen imitations of its other products in the past were *not* confused, flatly denying that anyone would mistake the CTS sun

catcher for Country Glass's work:

> Q.  But with regard to the sun catcher that we have marked as Exhibit 8 [the CTS product], do you know of anybody, as you sit here today, that thinks that Exhibit 8 was ever created by you?

> A.  No.  I don't think so.  That would be -- no.  They have a different style.

Ex. 2 at p.80, l.23-p.81, l.11; p.91, ll.11-16; see also SOF ¶49.

Similarly, Glass Eye has emphasized throughout that its customers were discerning enough to never be confused by a CTS product:  "I believe my customers are discriminating enough to recognize my work….  I can only say that my customers recognize my work and realize that [the CTS product] was not my work."  Ex. 1 at p.30, ll.13-14; p.32, ll.12-13; SOF ¶23.  While Glass Eye has claimed that "as many as 20" people asked if it had been selling its sconces to CTS, Glass Eye has never identified a single such customer or detailed any such conversations.  SOF ¶27.  Cf. IAMAW, 103 F.3d at 206 (criticizing the plaintiff's dearth of actual confusion evidence, stating that "summary judgment cannot be sidestepped by pointing to evidence that is merely colorable or suggestive, or evidence that lacks substance" and noting in particular lack of affidavits from any allegedly confused customers).

Like Glass Eye, Aunt Sadie's claimed that some customers had asked if Aunt Sadie's was selling its products to CTS, but admitted that no customer ever stated that they believed that Aunt Sadie's made the CTS candles.  SOF ¶66.  Indeed, the one retail customer who did write to Aunt Sadie's admitted that, at her company, "We are fans of your creative candles *and non-fans of the Christmas Tree Shop copycat* standards" -- plainly proving an educated awareness of the difference between the two product lines.  SOF at ¶67; see Fisher Stoves, 626 F.2d at 195 (evidence not compelling where consumers asked about copying, wanted to know which stove was made first, and asked if companies were affiliated; "Far from revealing such confusion, the

above statements indicate that these customers, at least, had the difference in source clearly in mind."); Pignons, 657 F.2d at 490-91 (affirming that consumer's letter demonstrated a *lack* of confusion about the differences between the products where letter stated "I wondered if [defendants] had bought and were distributing your camera").

In sum, plaintiffs' record falls far short of the caliber of evidence from which courts in the First Circuit have concluded that actual confusion was established.  See, e.g., Boston Athletic (consumer attempted to return defendant's product to plaintiff's sales booth, and resisted clarification); Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 17-18 (1st Cir. 2004) (evidence of misdirected premium payments, claim forms and communications from consumers confused between insurance providers).  Indeed, the First Circuit Court of Appeals has cautioned that "a single misdirected communication is very weak evidence of consumer confusion." Pignons, 657 F.2d at 489-90.  Here, plaintiffs have not even adduced that much.

### E.     Factor 7:  CTS's Intent Was Not to "Pass Off" or Confuse, But to Create Aesthetically Pleasing Products

To succeed on the factor of "intent," plaintiffs must show more than whether CTS sought to copy the allegedly infringed items; they must show that CTS intended to "pass off" its products as those in fact made by plaintiffs.  See Pignons, 657 F.2d at 491 (focusing on the lack of any evidence showing "palming off " or "intent to deceive"); Yankee Candle, 259 F.3d at 45 ("[T]he relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another.").  The undisputed record, however, establishes that CTS's intent in choosing the relevant product designs was only to create a pleasing and marketable product, not to trick consumers.

For example, CTS's glass buyers acknowledged that the Glass Eye sconce and Country

Glass sun catcher were used for inspiration in creating the CTS products, but never with any intent to directly duplicate the items or confuse consumers. SOF ¶¶16-17, 44. CTS's candle buyer stated that the design of the labels for its candles was based on the success of other CTS birthday- and baby-related items, while the size of the candle was determined by what was available at the factory in China. SOF ¶61. There is no record evidence suggesting that the designers of the CTS candles were influenced by -- or even aware of -- the Aunt Sadie's candles in any way. SOF ¶62. Further, CTS's wood buyer purchased the CTS plaques directly from a selection of items on a wholesaler's shelf in China -- CTS never designed these plaques. SOF ¶74. In sum, not one CTS product at issue in this case was designed with an intent to confuse customers; CTS's intent was solely to produce and sell inexpensive products that would be well-received by the CTS shopper. See Pignons, 657 F.2d at 491 ("[D]espite their general, conclusory allegations of 'willfulness,' plaintiffs have not adduced a scintilla of evidence of palming off, intent to deceive, or any effort whatsoever by [defendants] to benefit from Pignons' reputation"); Libman Co. v. Vining Industries, Inc., 69 F.3d 1360, 1363 (7th Cir. 1995) (Posner, J.) (finding no liability where a manufacturer simply had inferred from a competitor's success "that consumers like brooms with contrasting color bands, and decided to climb on the bandwagon. *We call that competition, not bad faith*, provided there is no intention to confuse, and, so far as appears, there was none.") (emphasis added); Smith v. Chanel, Inc., 402 F.2d 562, 567 (9th Cir. 1968) ("A competitor's chief weapon is his ability to represent his product as being equivalent and cheaper.") (citation omitted).

As in Pignons and Libman and Smith, CTS was simply engaging in competition, not courting customer confusion. Under the instant circumstances, and given the undisputed evidence of consumers' keen appreciation of the differences between the relevant products, the

law encourages CTS's brand of competition:

> [Plaintiffs] are not entitled to monopolize the public's desire for the unpatented product, even though they themselves created that desire at great effort and expense...
>
> Moreover, [the plaintiffs'] reputation is not directly at stake. [The defendants] make[] it clear that the product they offer is their own. If it proves to be inferior, they, not [plaintiffs], will bear the burden of consumer disapproval.

Smith, 402 F.2d at 568-69 (internal citations and quotations omitted).

### F.    Factor 8:  The Weakness of Plaintiffs' Alleged Trade Dress

As established supra at Section I(A) and fn.6, plaintiffs' claimed trade dresses are so deficient that they have not acquired the secondary meaning necessary to receive Lanham Act protection in the first place.  See DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 606 (1st Cir. 1992) (explaining that "strength" is the same as secondary meaning because it refers to the product's "ability to tell the public that [it] serves a special trademark function, namely, that it denotes a product or service that comes from a particular 'source.'").  But even if plaintiffs have established some secondary meaning, it is extremely weak and does not support a finding of likelihood of confusion.  Cf. Pignons, 657 F.2d at 492 ("'Strong' marks are accorded broader protection against infringement than are 'weak' marks.").

Glass Eye admitted that customers would not recognize a Glass Eye design unless they went to its gallery and were educated on its products.  SOF ¶8.  Country Glass admitted that the elements of the sun catcher's trade dress were functional, or were used throughout the glass industry, and therefore could not be considered "signature" design elements.  SOF ¶¶35-36.  Aunt Sadie's trademarked the catchphrase "candles in a can" but cannot claim trade dress protection in the size and shape of the can itself because these features are fundamentally functional.  SOF ¶¶55, 57; I.P. Lund, 163 F.3d at 39.  And Boerman has provided no evidence whatsoever on the issue of secondary meaning.  SOF ¶72.  If, therefore, any secondary meaning

is found in these products, it is extraordinarily weak and thus moves this final factor in favor of CTS as well.

### III.    Plaintiffs Cannot Prove Unfair Competition Because There Is No Evidence of Likelihood of Confusion

Plaintiffs' Second Cause of Action claims unfair competition by CTS, incorporating by reference the First Cause of Action and adding only generalized allegations of unauthorized (and inferior) copying of their products and consumer confusion as to the source of the CTS "copies." Amended Complaint at ¶¶26-29.  To recover on a claim of unfair competition under Massachusetts law, a plaintiff must show "*either* 'palming off' or that the features of the product... have acquired a secondary meaning such that confusion as to its source is likely to arise if the defendant is allowed to copy them," where *palming off* is defined as "an attempt to deceive the public into believing it is trading with one person when in fact it is dealing with another." Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 768-69 (1986) (emphasis in original; internal quotations omitted).  "Under either theory, it is evident that the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services." Datacomm, 396 Mass. at 769.  On the grounds established above, plaintiffs have failed to adduce any evidence of "palming off" (see Section II(E) and fn.4, supra), secondary meaning (see Section I(A) and fn.6, supra) or likelihood of consumer confusion (see Section II, supra).[9]  Their claims of unfair competition must therefore fail.

---

[9] CTS has addressed plaintiffs' unfair competition claims under Massachusetts law because their Count Two makes no reference to the Lanham Act (in contrast to their Count One which specifically alleges violations of Section 43(a) of the Act).  Even if plaintiffs had alleged unfair competition in violation of the Lanham Act, however, the standard is effectively the same -- to survive summary judgment on claims of unfair competition under the Lanham Act, plaintiffs must demonstrate a *substantial likelihood of confusion*.  See Beacon Mutual, 376 F.3d at 14-15 (analyzing confusion using the eight factors of I.P. Lund).

**IV.    Plaintiffs' Count for Declaratory and Injunctive Relief Must Fail Where the Underlying Claims Have Failed**

Plaintiffs' "Sixth Cause of Action" claims that plaintiffs will be irreparably harmed in the absence of declaratory and injunctive relief, but sets forth no new allegations of fact.  Amended Complaint at ¶¶62-66.  On the grounds established above, plaintiffs have failed to show that any reasonable trier of fact could find a violation of any protectible trade dress or unfair competition; their redundant count requesting declaratory and injunctive relief must therefore fail.

<u>CONCLUSION</u>

As the U.S. Supreme Court has recognized, "[c]opying is not always discouraged or disfavored by the laws which preserve our competitive economy;" <u>TrafFix</u>, 532 U.S. at 29.  As a consequence, "The primary purpose of trade dress is to protect *that which identifies a product's source*," not to prevent price competition or rightful imitation.  <u>Yankee Candle</u>, 259 F.3d at 38.  Plaintiffs no doubt feel wronged by CTS's price competition, but that alone provides no basis for a viable claim under the laws of trade dress or unfair competition.  Without some showing of secondary meaning and a wrongful intent to confuse, and on the undisputed facts and law outlined above, this Court should enter summary judgment in favor of CTS on plaintiffs' First, Second, and Sixth Causes of Action.

Respectfully submitted,

**CHRISTMAS TREE SHOPS, INC.**
By its attorneys:

 /s/  Carrie Kei Heim
Peter A. Biagetti, Esq., BBO# 042310
Carrie Kei Heim, Esq., BBO# 652147
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, PC
One Financial Center
Boston, MA  02111
Tel. 617-542-6000
Dated: May 15, 2006          Fax 617-542-2241

John F. Knight                                          11/09/2005

1              VOL. I, PAGES 1 - 101

2         IN THE UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF MASSACHUSETTS

4

5     JOHN KNIGHT, DONNA RUSSELL KNIGHT,

6     CHARLES COLE, VIIU NIILER, COUNTRY GLASS

7     SHOP, AUNT SADIE'S, INC., AND SUSAN BOERMAN

8                   Plaintiffs

9     V.

10    CHRISTMAS TREE SHOPS, INC.

11                   Defendant

12

13              - - - - - - - -

14        30(b)(6) Notice to The Glass Eye Gallery

15          Deposition of John F. Knight

16          Wednesday, November 9, 2005

17                 11:00 a.m.

18    Mintz Levin Cohn Ferris Glovsky and Popeo, PC

19             One Financial Center

20             Boston, Massachusetts

21              - - - - - - - -

22        Reporter:  Deborah Roth, RPR/CSR

23

24

CERTIFIED ORIGINAL
LEGALINK BOSTON

John F. Knight                                    11/09/2005

2

1    PRESENT:

2

3

4    Joel D. Joseph, Esq.

5    Joseph & Associates

6    7272 Wisconsin Avenue, Suite 300

7    Bethesda, Maryland  20814

8    301 941 1989

9    For the Plaintiffs

10

11

12   Peter A. Biagetti, Esq.

13   Carrie Kei Heim, Esq.

14   Mintz Levin Cohn Ferris Glovsky and Popeo, PC

15   One Financial Center

16   Boston, Massachusetts  02111

17   617 542 6000

18   For the Defendant

19

20   ALSO PRESENT:  Kenneth Bradley, Esq.

21                  Donna Knight

22

23

24

John F. Knight                                          11/09/2005

30

| 11:34:26 | 1 | Q.  How were they able to, in your words, |
| 11:34:31 | 2 | discriminate between the Christmas Tree Shop |
| 11:34:32 | 3 | version and your version? |
| 11:34:33 | 4 | A.  Because they are accustomed to buying only |
| 11:34:36 | 5 | quality handcrafts.  When they were looking for a |
| 11:34:39 | 6 | gift, when they are looking for that type of item, |
| 11:34:42 | 7 | they look to us or comparable type galleries and |
| 11:34:47 | 8 | not the Christmas Tree Shop. |
| 11:34:48 | 9 | Q.  So other the than the place in which the |
| 11:34:51 | 10 | sconce was located, was there any other way that |
| 11:34:54 | 11 | any of them told you that they could tell that it |
| 11:34:56 | 12 | was a copy and not your work? |
| 11:34:58 | 13 | A.  Yes.  I believe my customers are |
| 11:35:02 | 14 | discriminating enough to recognize my work. |
| 11:35:05 | 15 | Q.  I believe you, but just so you understand |
| 11:35:07 | 16 | my question, I am trying to understand whether you |
| 11:35:11 | 17 | can recall what they said to you that led you to |
| 11:35:15 | 18 | believe that they had been able to discriminate |
| 11:35:17 | 19 | other than the place in which the sconce was |
| 11:35:19 | 20 | located. |
| 11:35:20 | 21 | A.  No.  No. |
| 11:35:21 | 22 | Q.  Okay.  We will call these customers the |
| 11:35:37 | 23 | discriminating customers. |
| 11:35:39 | 24 | Were most of them ones that you would |

LegaLink Boston
(617) 542-0039

John F. Knight                                      11/09/2005

32

| | | |
|---|---|---|
| ·36:38 | 1 | Q.  To two? |
| 11:36:39 | 2 | A.  I said more than two. |
| 11:36:40 | 3 | Q.  Do you have a better idea than at least |
| 11:36:44 | 4 | two? |
| 11:36:44 | 5 | A.  Repeat the question. |
| 11:36:46 | 6 | Q.  How many people in your estimation, in your |
| 11:36:53 | 7 | words, were able to discriminate between the |
| 11:36:55 | 8 | Christmas Tree Shop sconce and the Glass Eye |
| 11:36:58 | 9 | Gallery sconce? |
| 11:36:58 | 10 | A.  Actual number, I can't. |
| 11:37:00 | 11 | Q.  Range? |
| 11:37:01 | 12 | A.  I can only say that my customers recognize |
| : 37:06 | 13 | my work and realize that was not my work. |
| 11:37:09 | 14 | Q.  I appreciate that.  I am trying to find out |
| 11:37:12 | 15 | whether it was more or less than ten? |
| 11:37:15 | 16 | A.  I can't give you an exact number. |
| 11:37:18 | 17 | Q.  Can you give me a range? |
| 11:37:19 | 18 | A.  No. |
| 11:37:20 | 19 | Q.  So I was wrong.  Instead of it being more |
| 11:37:23 | 20 | than one, your best estimate is that it was more |
| 11:37:26 | 21 | than two? |
| 11:37:26 | 22 | A.  Yes. |
| 11:37:40 | 23 | Q.  Now let's focus on what you said was |
| 11:37:43 | 24 | approximately 20 people who asked, in words or |

John F. Knight                                          11/09/2005

51

| :02:55 | 1 | Q.  Any other features between the textured |
| 12:03:00 | 2 | soldering and the copper versus lead wrapping that |
| 12:03:03 | 3 | would be apparently inferior to a customer of |
| 12:03:07 | 4 | yours? |
| 12:03:07 | 5 | A.  No. |
| 12:03:07 | 6 | Q.  Those are the only two? |
| 12:03:08 | 7 | A.  Yes. |
| 12:03:10 | 8 | Q.  How about people who are not customers of |
| 12:03:14 | 9 | your gallery, do you think that there would be any |
| 12:03:18 | 10 | features that would appear inferior? |
| 12:03:21 | 11 | A.  The price tag. |
| 12:03:22 | 12 | Q.  Explain. |
| 03:23 | 13 | A.  They would see mine at $32.95 and this at |
| 12:03:29 | 14 | $1.99, and unfortunately the bulk of businesses in |
| 12:03:32 | 15 | this country are guided by dollars and not always |
| 12:03:35 | 16 | by quality. |
| 12:03:35 | 17 | Q.  When you said the price tag is one way that |
| 12:03:38 | 18 | the Christmas Tree Shop version would appear |
| 12:03:42 | 19 | inferior, are you telling me that somebody who sees |
| 12:03:48 | 20 | $1.99 would know that this is a product of inferior |
| 12:03:52 | 21 | craftsmanship? |
| 12:03:54 | 22 | A.  I believe if they were common-sensible |
| 12:03:56 | 23 | enough, they would know it. |
| 12:04:04 | 24 | Q.  And did any of the folks who asked whether |

John F. Knight                                          11/09/2005

92

| | |
|---|---|
| 03:25 | 1 |

    A.  Normally, all of our bags which we use have

an enlarged version of the top half of that

sticker.  We flipped a coin, and I won out as the

more attractive.  So my picture is on all of the

bags.

    Q.  You mean the logo?

    A.  Yes.

    Q.  We talked about the profile of the Glass

Eye Gallery customer.

        Does it differ in any way from what you

believe the profile is from the typical Christmas

Tree Shop customer?

    A.  I don't want put any discriminatory remarks

in concerning what -- of people's customers.

    Q.  Are you trying --

    A.  I am trying to be nice.

    Q.  I know that, and I appreciate that.

        I am trying to understand what, if any,

difference there is between the markets, without

being pejorative.

    A.  And everyone loves a bargain, and they go

to the Christmas Tree Shop.  Not everyone comes to

the Glass Eye.

    Q.  Leaving aside why a customer goes to the

The timestamps for each line (left column):

| Time | Line |
|---|---|
| 03:25 | 1 |
| 13:03:31 | 2 |
| 13:03:36 | 3 |
| 13:03:41 | 4 |
| 13:03:43 | 5 |
| 13:03:46 | 6 |
| 13:03:48 | 7 |
| 13:03:50 | 8 |
| 13:04:23 | 9 |
| 13:04:24 | 10 |
| 13:04:27 | 11 |
| 13:04:30 | 12 |
| 04:31 | 13 |
| 13:04:38 | 14 |
| 13:04:42 | 15 |
| 13:04:44 | 16 |
| 13:04:45 | 17 |
| 13:04:48 | 18 |
| 13:04:49 | 19 |
| 13:04:51 | 20 |
| 13:04:53 | 21 |
| 13:04:59 | 22 |
| 13:05:04 | 23 |
| 13:05:04 | 24 |

John F. Knight                                                11/09/2005

93

| | | |
|---|---|---|
| 05:08 | 1 | Christmas Tree Shops, is it fair to say that the |
| 13:05:11 | 2 | Glass Eye Gallery is not targeting or after the |
| 13:05:14 | 3 | typical Christmas Tree Shop customer? |
| 13:05:15 | 4 | A.  No. |
| 13:05:16 | 5 | Q.  You are after a different customer? |
| 13:05:18 | 6 | A.  Yes. |
| 13:05:19 | 7 | Q.  How would you describe the difference, |
| 13:05:22 | 8 | without being pejorative? |
| 13:05:22 | 9 | A.  We are not looking for bargain-hunters.  We |
| 13:05:26 | 10 | are not looking for people who are interested in |
| 13:05:30 | 11 | lesser-quality items. |
| 13:05:33 | 12 | We are looking for people who are |
| 1  )5:35 | 13 | interested, not only in the quality of the work |
| 13:05:37 | 14 | that we make, but the quality of the work that we |
| 13:05:40 | 15 | carry. |
| 13:05:41 | 16 | Q.  And from your observation over the years, |
| 13:05:43 | 17 | the Christmas Tree Shop customer typically is the |
| 13:05:46 | 18 | bargain-hunter type? |
| 13:05:48 | 19 | A.  Correct. |
| 13:06:12 | 20 | Q.  You mentioned the labeling as one way you |
| 13:06:16 | 21 | communicate to customers that certain items in the |
| 13:06:19 | 22 | shop are made in North America. |
| 13:06:21 | 23 | A.  Right. |
| 13:06:21 | 24 | Q.  Any other way that staff people might relay |

LegaLink Boston
(617) 542-0039

John F. Knight                                           11/09/2005

101

1   COMMONWEALTH OF MASSACHUSETTS )

2   SUFFOLK, SS                  )

3

4   I, Deborah L. Roth, and Notary Public in and for

5   the Commonwealth of Massachusetts, do hereby

6   certify that there came before me on November 9,

7   2005, the person hereinbefore named, who was by me

8   duly sworn to the truth concerning any knowledge in

9   this cause; that that person was thereupon examined

10  under oath, and the examination reduced to

11  typewriting; and that the deposition is a true

12  record of the testimony given by the witness.

13  I further certify that I am neither related to nor

14  employed by any attorney or counsel employed by

15  the parties hereto or financially interested in the

16  action.

17  In witness whereof, I have hereunto set my hand

18  this 17th th day of November 2005.

19

20                                    CERTIFIED ORIGINAL
                                      LEGALINK BOSTON

21  DEBORAH ROTH, Notary Public

22  My commission expires: 2/7/08

23

24

LegaLink Boston
(617) 542-0039

Case 1:04-cv-12698-JLT    Document 45-3    Filed 05/15/2006    Page 1 of 8

1

1   VOL. I, PAGES 1 - 109

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE DISTRICT OF MASSACHUSETTS

4

5   JOHN KNIGHT, DONNA RUSSELL KNIGHT,

6   CHARLES COLE, VIIU NIILER, COUNTRY GLASS

7   SHOP, AUNT SADIE'S, INC., AND SUSAN BOERMAN

8                        Plaintiffs

9   V.

10  CHRISTMAS TREE SHOPS, INC.

11                      Defendant

12

13           - - - - - - - -

14       30(b)(6) Notice to Country Glass

15         Deposition of Viiu Niiler

16       Thursday, November 10, 2005

17              10:02 a.m.

18   Mintz Levin Cohn Ferris Glovsky and Popeo, PC

19           One Financial Center

20           Boston, Massachusetts

21           - - - - - - - -

22       Reporter:  Deborah Roth, RPR/CSR

23

24

**CERTIFIED ORIGINAL LEGALINK BOSTON**

```
                                                              2
 1    PRESENT:

 2

 3    Joel D. Joseph, Esq.

 4    Joseph & Associates

 5    7272 Wisconsin Avenue, Suite 300

 6    Bethesda, Maryland  20814

 7    301 941 1989

 8    For the Plaintiffs

 9

10    Peter A. Biagetti, Esq.

11    Carrie Kei Heim, Esq.

12    Mintz Levin Cohn Ferris Glovsky and Popeo, PC

13    One Financial Center

14    Boston, Massachusetts  02111

15    617 542 6000

16    For the Defendant

17

18    ALSO PRESENT:  Kenneth Bradley, Esq.

19                   Charles Cole

20

21

22

23

24
```

Viiu Niiler                                    11/10/2005

46

| 52:39 | 1 | there anything in particular about the cobalt blue |
| 10:52:44 | 2 | color that customers would recognize as a |
| 10:52:46 | 3 | signature; that is, if you see cobalt blue, it must |
| 10:52:50 | 4 | be Country Glass? |
| 10:52:51 | 5 | A.  Cobalt is a favorite color.  Our favorite |
| 10:52:57 | 6 | one is --  it is the color that we sell the most of |
| 10:53:01 | 7 | in this sun catcher.  That's everybody's favorite |
| 10:53:06 | 8 | color in that. |
| 10:53:07 | 9 | Q.  Besides being a popular color, let me come |
| 10:53:10 | 10 | back to that signature notion. |
| 10:53:12 | 11 | A.  Yes. |
| 10:53:13 | 12 | Q.  Is the fact that a sun catcher is cobalt |
| 53:18 | 13 | blue one of those features that you think tips |
| 10:53:21 | 14 | people off that must be a Country Glass sun catcher |
| 10:53:26 | 15 | or not? |
| 10:53:26 | 16 | A.  Boy, that's a hard one. |
| 10:53:29 | 17 | MR. JOSEPH:  If you don't know. |
| 10:53:35 | 18 | A.  I can't say.  Country Glass cannot make a |
| 10:53:42 | 19 | claim to owning -- ownership to cobalt blue. |
| 10:53:46 | 20 | Cobalt blue is a favorite glass color always for |
| 10:53:50 | 21 | all glassmakers. |
| 10:53:52 | 22 | Q.  Fair enough. |
| 10:53:52 | 23 | A.  That's all I can say. |
| 10:53:54 | 24 | Q.  That's all I can ask for. |

Viiu Niiler                                             11/10/2005

80

| | | |
|---|---|---|
| 48:37 | 1 | A.  Well, the only thing I was saying is this |
| 11:48:47 | 2 | carved.  It is carved, I am guessing, a steel mold. |
| 11:48:51 | 3 | Q.  How does that translate to appearance? |
| 11:48:54 | 4 | A.  The lines are very flat and rigid.  They |
| 11:49:03 | 5 | don't have a flow to them.  That would be my major |
| 11:49:07 | 6 | differentiation. |
| 11:49:11 | 7 | Q.  Let me see if I got all of the ones you |
| 11:49:15 | 8 | mentioned. |
| 11:49:15 | 9 | The orange peel quality to the outer |
| 11:49:20 | 10 | edge of the front and back? |
| 11:49:21 | 11 | A.  Yes. |
| 11:49:21 | 12 | Q.  The fact that the Christmas Tree Shop sun |
| 49:23 | 13 | catcher is, in your words, full of bubbles? |
| 11:49:26 | 14 | A.  Yes. |
| 11:49:26 | 15 | Q.  And, finally, the fact that the lines in |
| 11:49:29 | 16 | the Christmas Tree Shop sun catcher are flat and |
| 11:49:34 | 17 | rigid? |
| 11:49:35 | 18 | A.  Yes. |
| 11:49:35 | 19 | Q.  Is it fair to say that all three of those |
| 11:49:38 | 20 | features are not ones that any of your customers |
| 11:49:41 | 21 | would ever associate with a Country Glass creation? |
| 11:49:46 | 22 | A.  I would say no. |
| 11:49:49 | 23 | I have often people come up to me and |
| 11:49:52 | 24 | say that I saw a sun catcher, it looked like yours, |

Viiu Niiler                                    11/10/2005

81

| :49:56 | 1 | but it had -- the carving was shallow, rigid, not |
| 11:50:03 | 2 | -- didn't have a flow to it, and it looked like |
| 11:50:06 | 3 | somebody was trying to copy you, but... |
| 11:50:09 | 4 | Q.  But they didn't? |
| 11:50:10 | 5 | A.  They didn't.  They didn't get it. |
| 11:50:12 | 6 | Q.  Did any of those folks tell you that the |
| 11:50:15 | 7 | copy they had in mind was the Christmas Tree Shop |
| 11:50:17 | 8 | version? |
| 11:50:18 | 9 | A.  No.  I have had -- over the years, I have |
| 11:50:23 | 10 | people, like, make copies of the little ones we |
| 11:50:27 | 11 | make. |
| 11:50:27 | 12 | Q.  Of the smaller sun catcher? |
| 50:28 | 13 | A.  Yeah. |
| 11:50:29 | 14 | Q.  Have you ever been involved in a lawsuit |
| 11:50:32 | 15 | over your designs before this one? |
| 11:50:35 | 16 | A.  Nope. |
| 11:50:36 | 17 | Q.  Have you ever sought to get any kind of |
| 11:50:39 | 18 | registered protection -- |
| 11:50:42 | 19 | A.  Copyright. |
| 11:50:43 | 20 | Q.  -- for any of your designs? |
| 11:50:44 | 21 | A.  We are in the process of doing that.  We |
| 11:50:48 | 22 | have been -- not been preoccupied with that, but we |
| 11:50:50 | 23 | will have to be, yes. |
| 11:50:51 | 24 | Q.  Have you ever done that for the sun |

Viiu Niiler                                    11/10/2005

91

| | | |
|---|---|---|
| ·03:15 | 1 | with regard to injury to reputation. |
| 12:03:18 | 2 | Can you explain to me in what ways, if |
| 12:03:21 | 3 | any, the reputation of the Country Glass Shop has |
| 12:03:26 | 4 | suffered as a result of the Christmas Tree Shop |
| 12:03:29 | 5 | product? |
| 12:03:30 | 6 | A.  Artist reputation. |
| 12:03:44 | 7 | I don't know.  It's my -- when you |
| 12:03:52 | 8 | create an art product, it just -- it's just a bad |
| 12:03:59 | 9 | idea to have somebody copy it.  They could have |
| 12:04:07 | 10 | taken it and changed it.  It's so easy to do. |
| 12:04:12 | 11 | Q.  But with regard to the sun catcher that we |
| 12:04:17 | 12 | have marked as Exhibit 8, do you know of anybody, |
| : 04:22 | 13 | as you sit here today, that thinks that Exhibit 8 |
| 12:04:25 | 14 | was ever created by you? |
| 12:04:26 | 15 | A.  No.  I don't think so.  That would be -- |
| 12:04:29 | 16 | no.  They have a different style. |
| 12:04:37 | 17 | Q.  So you have a concern understandably about |
| 12:04:40 | 18 | confusion, but not a particular case report from a |
| 12:04:44 | 19 | customer that you can point to as you sit here |
| 12:04:47 | 20 | today that's actually -- |
| 12:04:49 | 21 | A.  See, I'm not in touch with the customers |
| 12:04:54 | 22 | that buy this.  These are not the kind of people |
| 12:04:57 | 23 | that come to our shop. |
| 12:04:58 | 24 | Q.  Meaning the Christmas Tree version? |

Viiu Niiler                                    11/10/2005

92

| | |
|---|---|
| ˙ ·05:00 | 1 |
| 12:05:02 | 2 |
| 12:05:04 | 3 |
| 12:05:05 | 4 |
| 12:05:10 | 5 |
| 12:05:14 | 6 |
| 12:05:19 | 7 |
| 12:05:22 | 8 |
| 12:05:23 | 9 |
| 12:05:26 | 10 |
| 12:05:28 | 11 |
| 12:05:34 | 12 |
| ? 05:37 | 13 |
| 12:05:42 | 14 |
| 12:05:44 | 15 |
| 12:05:48 | 16 |
| 12:05:51 | 17 |
| 12:05:53 | 18 |
| 12:05:56 | 19 |
| 12:05:58 | 20 |
| 12:05:58 | 21 |
| 12:06:04 | 22 |
| 12:06:07 | 23 |
| 12:06:11 | 24 |

A.   Yes.

Q.   **Expand on that.  What kind of people come to Christmas Tree Shops?**

A.   There is this -- there is a movement to protect the American -- the craftsman in this country from Chinese imports, and they would like to see that happen, the people that created -- they are innovative.

They have been creative.  They have small businesses.  They are all around the country, and they worked very, very hard to create craft organizations, art organizations, to make themselves a living that's sort of viable, and that they can be part of the art world and create something beautiful for their neighbors and friends to appreciate, and they want to have that lifestyle --

Q.   **So are those artisans --**

A.   -- that what we like.

Q.   **Sure.**

A.   All of our friends own -- we go to dinner. They all have our plates on the table.  They love them, and they have other artisan people's work, and they are committed to that.  They are committed

Viiu Niiler                                                    11/10/2005

109

```
 1    COMMONWEALTH OF MASSACHUSETTS )

 2    SUFFOLK, SS                  )

 3

 4    I, Deborah L. Roth, and Notary Public in and for

 5    the Commonwealth of Massachusetts, do hereby

 6    certify  that there came before me on November 10,

 7    2005, the  person hereinbefore named, who was by me

 8    duly sworn  to the truth concerning any knowledge

 9    in this cause; that that person was thereupon

10    examined under oath,  and the examination reduced

11    to typewriting; and that the deposition is a true

12    record of the testimony  given by the witness.

13    I further certify that I am neither related to nor

14    employed by any attorney or counsel employed by

15    the parties hereto or financially interested in the

16    action.

17    In witness whereof, I have hereunto set my hand

18    this 17th day of November 2005.

19

20        Deborah Roth              CERTIFIED ORIGINAL
                                    LEGALINK BOSTON
21    DEBORAH ROTH, Notary Public

22    My commission expires: 2/7/08

23

24
```

100_2613 (1632x1232x16M jpeg)



CTS0346



CTS0347







Nantucket Dist.
Karen Sutphen 9/04

CTS0202

*Aunt Sadie's* ™

- HOME
- ABOUT AUNT SADIE
- AUNT SADIES CANDLES
  - AUTUMN
  - CHRISTMAS
  - FAVORITE THINGS
  - FLORALS
  - FOUR-LEGGED FRIENDS
  - FRUITY
  - GENTLEMEN'S
  - HOUSE AND HOME
  - LICENSED
  - LOVE AND ROMANCE
  - MISCELLANEOUS HOLIDAY
  - OUR FAMOUS PINE SCENT
  - SPA
  - SPRINGTIME
  - SUMMERTIME FUN
  - THE MADDY LOUNGE
  - VINTAGE STATE
- OTHER SWELL STUFF
- GIFT IDEAS

View Bag | Checkout   search

( SEARCH )

## APPLE PIE

Sure we smile thinking of Aunt Sadie in her apron, rolling out those light-as-air pie crusts. But what we really remember is the sweet aroma of pies baking, engulfing her whole house and teasingly seducing neighbors blocks away. With each whiff came the promise of something so completely satisfying that we long for it decades later. Rest assured, this candle is worthy of her namesake. An Aunt Sadie's favorite

Scent: Apple

Qty:  1    @ $16.00

Add Gift Wrap? :  ☐  @ $2.50

( ADD TO BAG )

Store Locator | Wholesale Login | Contact Us | Credits
©2006 Aunt Sadie's, Inc.

GET FIREFOX

*Aunt Sadie's*

- HOME
- ABOUT AUNT SADIE
- AUNT SADIES CANDLES
  - ○ AUTUMN
  - ○ CHRISTMAS
  - ○ FAVORITE THINGS
  - ○ FLORALS
  - ○ FOUR-LEGGED FRIENDS
  - ○ FRUITY
  - ○ GENTLEMEN'S
  - ○ HOUSE AND HOME
  - ○ LICENSED
  - ○ LOVE AND ROMANCE
  - ○ MISCELLANEOUS HOLIDAY
  - ○ OUR FAMOUS PINE SCENT
  - ○ SPA
  - ○ SPRINGTIME
  - ○ SUMMERTIME FUN
  - ○ THE MADDY LOUNGE
  - ○ VINTAGE STATE
- OTHER SWELL STUFF
- GIFT IDEAS

View Bag | Checkout   search    ( SEARCH )



## HAPPY BIRTHDAY CAKETOP

Even people who don't like to celebrate birthdays love this candle.

**Scent:** Pina Colado

Qty:   1      @ $16.00

Add Gift Wrap? :  ☐ @ $2.50

( ADD TO BAG )

Store Locator | Wholesale Login | Contact Us | Credits
©2006 Aunt Sadie's, Inc.
[ GET FIREFOX ]



# quorra apothecary

## purveyors of fine beauty potions

: makeup : skincare : body & bath : hair : fragrance : tools : men : baby : gifts :  **shopping bag**

Home > Gifts > Candles > **Aunt Sadie's It's A Girl Candle** >

## gifts

**shop by brand**

Choose Brand

GO

**shop by category**

**gifts**

Gifts under $25

Gifts $25 to $50

Fab Gifts over $50

Her

Him

Pyjamas, Robes & More

Archipelago Monogram Candles

Candles

Pets

Here Comes the Bride

 **free shipping**
on all orders over $70

**free samples**
with every order

---



### Aunt Sadie's It's A Girl Candle

$24.95

Baby stuff can be elegant and cute at the same time thanks to Emilio Gallardo. These baby powder scented candles by Aunt Sadie take candles to a whole new level. Retro-look tins contain scented candles that fill your home with delicious, comforting scents. Hand-poured and lead-free with wicks that burn for approx. 50 hours. Each approx. 4"h x 33/8"diam.

| product name | price | quantity | shopping bag |
|---|---|---|---|
| Aunt Sadie's It's A Girl Candle | $24.95 | 1 | add to basket |

# Lavender Fields



IT'S A BOY!

Email this to a friend

## It's a Boy Candle
**Baby stuff can be elegant and cute at the same time**

Our Price        Qty

$17.00           1

BUY

## Detailed Description
Scent: Baby Powder

Each Aunt Sadie's Candle is 100% hand-poured, hand-packaged, is lead free with a zinc wick. Aunt Sadie's Candles have a long 70 hour burn time!