**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN KNIGHT, DONNA RUSSELL KNIGHT d/b/a THE GLASS EYE GALLERY, CHARLES COLE, VIIU NIILER, COUNTRY GLASS SHOP, AUNT SADIE'S, INC., AND SUSAN BOERMAN,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CHRISTMAS TREE SHOPS, INC.,<br><br>　　　　Defendant. | Case No. 04 12698 JLT |

**CONSOLIDATED STATEMENT OF FACTS IN SUPPORT OF
CHRISTMAS TREE SHOPS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the undisputed facts on which defendant Christmas Tree Shops, Inc. ("CTS") relies in support of its Motion for Summary Judgment are specified below. As to each fact, the statement refers to a specific portion of the record where the fact may be found. Documents and deposition testimony supporting these factual statements are attached as exhibits to the Affidavit of Carrie Kei Heim (filed herewith).

**INDEX OF EXHIBITS**

**DEPOSITION EXCERPTS**

　1.　Deposition of Carolyn Cummings on behalf of CTS, dated September 23, 3005 (hereinafter "Cummings Depo."). See Affidavit of Carrie Kei Heim (hereinafter "Heim Aff.") at ¶2 and Ex. A.

2. Deposition of Gregory Bilezikian on behalf of CTS, dated November 8, 2005 (hereinafter "G.Bilezikian Depo."). See Heim Aff. at ¶3 and Ex. B.

3. Deposition of Janice Laliberte on behalf of CTS, dated November 8, 2005 (hereinafter "Laliberte Depo."). See Heim Aff. at ¶4 and Ex. C.

4. Deposition of Deborah Watts on behalf of CTS, dated November 8, 2005 (hereinafter "Watts Depo."). See Heim Aff. at ¶5 and Ex. D.

5. Glass Eye Gallery 30(b)(6) Deposition (John Knight), dated November 9, 2005 (hereinafter "Knight Depo."). See Heim Aff. at ¶6 and Ex. E.

6. Aunt Sadie's, Inc. 30(b)(6) Deposition (Gary Briggs), dated November 9, 2005 (hereinafter "Briggs Depo."). See Heim Aff. at ¶7 and Ex. F.

7. Country Glass Shop 30(b)(6) Deposition (Viiu Niiler), dated November 10, 2005 (hereinafter "Niiler Depo."). See Heim Aff. at ¶8 and Ex. G.

8. Deposition of Charles Bilezikian on behalf of CTS, dated February 7, 2006 (hereinafter "C.Bilezikian Depo."). See Heim Aff. at ¶9 and Ex. H.

**DOCUMENTS**

1. Drawing and photo of the "sconce" described at paragraph 20 of the Amended Complaint (hereinafter "Glass Eye sconce"). See Heim Aff. at ¶10 and Ex. I.

2. Sales numbers for the Glass Eye sconce. See Heim Aff. at ¶11 and Ex. J

3. Glass Eye advertising. See Heim Aff. at ¶12 and Ex. K.

4. Glass Eye logo and product labels. See Heim Aff. at ¶13 and Ex. L.

5. Sales records for the allegedly infringing CTS "wall vase." See Heim Aff. at ¶14 and Ex. M.

6. Photo of the "grape plate" described at paragraph 21 of the Amended Complaint (hereinafter "Country Glass Sun Catcher"). See Heim Aff. at ¶15 and Ex. N.

7. Sales numbers for the Country Glass Sun Catcher. See Heim Aff. at ¶16 and Ex. O.

8. Museum of Fine Arts catalog pages containing Country Glass products. See Heim Aff. at ¶17 and Ex. P.

9. Country Glass logo and product labels. See Heim Aff. at ¶18 and Ex. Q.

10. Photos of the allegedly infringing CTS "basket plate hanger." See Heim Aff. at ¶19 and Ex. R.

11. Sales records for the CTS basket plate hanger. See Heim Aff. at ¶20 and Ex. S.

12. Photos of the "Candles in a Can" described at paragraph 22 of the Amended Complaint (hereinafter "Aunt Sadie's Apple Pie, Happy Birthday, It's a Boy and It's a Girl Candles"). See Heim Aff. at ¶21 and Ex. T.

13. Sales numbers for the Aunt Sadie's Apple Pie, Happy Birthday, It's a Boy and It's a Girl Candles. See Heim Aff. at ¶22 and Ex. U.

14. Aunt Sadie's magazine promotions. See Heim Aff. at ¶23 and Ex. V.

15. Letter from Aunt Sadie's co-owner Gary Briggs to CTS, and attached letter from an Aunt Sadie's customer. See Heim Aff. at ¶24 and Ex. W.

16. Label designs for the allegedly infringing CTS "candle tins." See Heim Aff. at ¶25 and Ex. X.

17. Sales records for the CTS candle tins. See Heim Aff. at ¶26 and Ex. Y.

18. Front cover of the 29-page book, "It's Great to Create" by Susan R. Boerman, described at paragraph 14 of the Amended Complaint. See Heim Aff. at ¶27 and Ex. Z.

19. "It's Great to Create" pages 20-21 and 24-25. See Heim Aff. at ¶28 and Ex. AA.

20. Sales records for the allegedly infringing CTS "painted Christmas hanger" and "fall painted plaque."  See Heim Aff. at ¶29 and Ex. BB.

21. CTS advertising flyer.  See Heim Aff. at ¶30 and Ex. CC.

22. CTS price labels.  See Heim Aff. at ¶31 and Ex. DD.

## STATEMENT OF FACTS

### GLASS EYE, THE GLASS EYE SCONCE AND THE CTS WALL VASE

*The Glass Eye Gallery*

1. The Glass Eye Gallery is co-owned by Plaintiffs John Knight and Donna Russell Knight (collectively, "Glass Eye").  Glass Eye has been in the business of making glass creations for 35 years.  Knight Depo. at p.6, l.18-p.7, l.5.

2. The building that houses the Glass Eye Gallery is a Cape Cod house that is a combination gallery and residence.  The gallery portion of this building has approximately 950-1000 square feet of selling space.  Knight Depo. at p.7, l.8-p.9, l.9.

3. The Glass Eye Gallery sells blown and stained glass, pottery, fused glass, among other crafts made in North America.  Approximately 16 different styles of glass items were sold at The Glass Eye Gallery in 2002 and 2003, including candle holders, stained glass boxes, lamps, small panels, mirrors, wall sconces, and a variety of decorative and functional items.  Glass Eye makes all the stained glass items sold at the gallery.  Knight Depo. at p.13, l.21-p.14, l.3; p.14, ll.22-24; p.16, ll.3-11; p.17, ll.14-17; p.60, ll.19-22; p.87, l.21-p.88, l.1.

*The Glass Eye Sconce Design*

4. Glass Eye has made and sold a variety of glass wall sconces since 1992. Their primary purpose is to hang dry or live flower arrangements. Knight Depo. at p.40, ll.14-24; p.42, ll.21-23.

5. John and Donna Knight designed and made an opalescent glass wall sconce which they sold at The Glass Eye Gallery (hereinafter "the Glass Eye sconce"). Heim Aff. Ex. I; Knight Depo. at p.11, l.20-p.12, l.9; p.77, ll.13-20.

6. The colors of the Glass Eye sconce were chosen based on the popularity of other items in the Glass Eye Gallery, and based on John Knight's monitoring of popular trends. Knight Depo. at p.77, ll.21-24; p.78, ll.5-21; p.80, l.22-p.81, l.3.

7. There is no patent or copyright held on the Glass Eye sconce. Knight Depo. at p.81, ll.4-9.

8. The primary way a consumer would know that the Glass Eye sconce originated with and was created by Glass Eye was the fact that the item was sold in The Glass Eye Gallery. The general consuming public had no way of recognizing a Glass Eye design if they had not previously seen the products in The Glass Eye Gallery. None of the trade dress elements attributed to the Glass Eye sconce in paragraph 20 of the Amended Complaint is recognizable as being part of a Glass Eye design unless the consumer has been educated about Glass Eye's work and products. Knight Depo. at p.59, l.20-p.62, l.1; p.62, l.3-p.63, l.12; p.76, l.21-p.77, l.12.

9. No customer has ever spoken to John Knight about any of the features of the Glass Eye sconce that they might find distinctive. Knight Depo. at p.65, ll.14-22.

*Glass Eye Sconce Sales*

10. More than 1,000 Glass Eye sconces were sold at the Glass Eye Gallery from 2001 to 2003. Knight Depo. at p.97, l.19-p.98, l.24.

11. In 2002, thirty-six percent of Glass Eye's glass sales were attributable to sales of the Glass Eye sconce at issue in this case. In 2002, the Glass Eye sconce was sold for $31.95 or $32.95. Knight Depo. at p.16, l.16-p.17, l.11; p.21, ll.15-17; Heim Aff. Ex. J.

12. Approximately twenty Glass Eye sconces sold at their full price of $32.95 between January and April of 2003. Glass Eye discontinued the manufacture and regular retail sale of the Glass Eye sconce in early May 2003. Glass Eye sold the twelve sconces remaining in stock after discontinuation at its annual sale in October 2003. Knight Depo. at p.17, l.14-p.18, l.12; p.20, l.11-p.21, l.14.

*CTS and the CTS Wall Vase*

13. CTS has approximately 30 stores, each as big as 50,000 square feet, primarily located in the New England area. CTS carries a great range of merchandise, emphasizing bargain sales in its advertising, and buys thousands of items, often from vendors in China. C.Bilezikian Depo. at p.13, ll.15-18; p.17, ll.6-8; Heim Aff. Ex. CC.

14. CTS sold a "wall vase" for $1.99 in 2003, and the price was reduced to $1.00 in 2004. Heim Aff. Ex. M; Cummings Depo. at p.41, ll.1-19.

15. The CTS wall vase was made in China, and its label (pictured below) clearly stated "Made in China" alongside the CTS name and CTS's "sleigh" logo. Cummings Depo. at p.35, ll.11-13; Knight Depo. at p.47, ll.4-16; p.57, l.21-p.58, l.1; p.58, ll.10-20; Heim Aff. Ex. DD.



16. CTS sent the Glass Eye sconce to a vendor in China as a sample, but never instructed the manufacturer to copy the item directly. CTS later chose the colors for the CTS wall vase based on its buyer's personal preferences. Cummings Depo. at p.28, ll.6-15; p.34, ll.10-20.

17. CTS visits shows and vendors looking for trends, such as popular colors and ideas that are fresh, and may use new items on the market for inspiration. Cummings Depo. at p.11, l.16-p.13, l.17.

*Product Comparison*

18. The CTS wall vase is inferior to the Glass Eye sconce in craftsmanship and appearance. The Glass Eye sconce is solid, framed in copper that has an almost black appearance, has superior soldering and seaming with nice quality glass and is delicate. The CTS wall vase does not have the look of being handmade, is not solid, has inferior construction that can be pulled apart, is framed in a more square textured soft lead with a light gray color, is thinner, and has a ribbon hanger. Knight Depo. at p.48, l.9-p.50, l.24; C.Bilezikian Depo. at p.28, l.4-p.29, l.6; G.Bilezikian Depo. at p.23, l.20-p.28, l.2; Cummings Depo. at p.28, l.19-p.30, l.19.

19. "The price tag" of the CTS wall vase is another indication that the CTS wall vase was of lower quality and inferior craftsmanship than the Glass Eye sconce. Knight Depo. at p.51, ll.8-23.

*Glass Eye Customers and Their Reaction to the CTS Wall Vase*

20. The target market for Glass Eye products is a sophisticated customer who knows and appreciates discriminating crafts from American artisans. Glass Eye is not interested in

attracting the average CTS customer: "We are not looking for bargain-hunters. We are not looking for people who are interested in lesser-quality items." Knight Depo. at p.86, l.23-p.87, l.4; p.92, l.8-p.93, l.19; G.Bilezikian Depo. at p.26, ll.1-7.

21. A number of Glass Eye customers and employees said that they had seen a version of the Glass Eye sconce at CTS. Knight Depo. at p.18, l.15-p.20, l.1; p.27, l.10-p.28, l.20.

22. Some of these customers recognized that the CTS version was a "copy," while others asked John Knight if he had sold the Glass Eye design to CTS. Knight Depo. at p.27, ll.14-19.

23. The customers who recognized that the CTS version was a "copy" did so because they were accustomed to buying "only quality handcrafts" and sought out galleries like The Glass Eye for these purchases. As John Knight explained, "I believe my customers are discriminating enough to recognize my work." Knight Depo. at p.28, l.24-p.29, l.8; p.30, ll.1-14; p.32, ll.12-13.

24. Only one Glass Eye customer is known to have bought the CTS wall vase. This customer stated that she used to buy the Glass Eye sconce until she discovered she could buy the CTS wall vase for only $1.99. Knight Depo. at p.34, l.3-p.35, l.14.

25. John Knight displayed the Glass Eye sconce and the CTS wall vase side-by-side behind the sales counter at The Glass Eye Gallery starting in 2004 or 2005. The display was intended to invite questions from customers about the two versions of the wall sconce. The CTS wall vase was labeled "Produced by the Christmas Tree Shop" and the Glass Eye sconce was labeled "The Glass Eye." Knight Depo. at p.35, l.15-p.36, l.10; p.37, l.7-p.38, l.5.

26. The customer who stated that she bought the CTS wall vase asked if she could purchase the CTS sconce that John Knight had on display at The Glass Eye Gallery. She was informed that it was on display because it was a copy of the Glass Eye sconce. The customer replied, "I know. I used to purchase yours here, until I found I could buy them for $1.99, and they don't

have them anymore, and I want one more, and I see that one. Can I buy it?" She was informed that it was not for sale. Knight Depo. at p.34, ll.11-19.

27. Glass Eye stated that as many as 20 customers asked if Glass Eye had sold its design to CTS, but was unable to provide any other examples of consumers who were confused between the two sconces, or Glass Eye customers who purchased the CTS wall vase. Knight Depo. at p.31, ll.6-11; p.67, l.12-p.68, l.1.

*Glass Eye Advertising, Labeling, and Packaging*

28. The Glass Eye sconce was never included in any advertising or promotion in print. Glass Eye advertising generally features a single product or image with no prices. Knight Depo. at p.82, ll.16-21; Heim Aff. Ex. K.

29. Some of the Glass Eye sconces had a hang-tag that bore the Glass Eye logo (pictured below), and identified the item as being made by Donna and John Knight. Knight Depo. at p.89, ll.3-18; Heim Aff. Ex. L.



30. The Glass Eye Gallery gift boxed 99.9% of its products, including the Glass Eye sconce, upon purchase. The gift wrapping was distinctive, including a box with the Glass Eye logo, high-quality sea green wrapping paper, ribbon, and a distinctive "fu-fu" tissue paper flower

associated with the Glass Eye Gallery.  Purchased items were placed in a Glass Eye bag bearing an enlarged version of a portion of the Glass Eye logo.  Knight Depo. at p.89, l.22-p.92, l.7.

**COUNTRY GLASS, THE COUNTRY GLASS SUN CATCHER & THE CTS BASKET PLATE**

*The Country Glass Factory and Store*

31. Plaintiffs Charles Cole, Viiu Niiler and Country Glass Shop (collectively, "Country Glass") have designed, manufactured and sold glassworks from their Vermont factory for 30 years.  Niiler Depo. at p.5, ll.8-14; p.8, ll.1-13.

32. Located in a 150-year-old farmhouse on a back road, the Country Glass retail store is open during the summer for 16 weeks out of every year.  Niiler Depo. at p.6, l.11-p.7, l.20.

33. Country Glass also sells its creations to specialty retailers, some of whom have been Country Glass customers for decades.  Country Glass customers appreciate American crafts and the handmade quality of Country Glass products.  Niiler Depo. at p.19, l.22-p.21, l.16; p.24, l.3-p.26, l.4.

*The Country Glass Sun Catcher Design*

34. In 1998, Country Glass designed, made and sold a cobalt blue sun catcher bearing an image of a "Nantucket basket" filled with hydrangeas.  Heim Aff. Ex. N; Niiler Depo. at p.13, l.22-p.14, l.8; p.103, ll.16-23.

35. The mold used for the sun catcher is also used to make small plates and cheese servers.  The sun catcher was produced in six other colors, none of which were as popular as the cobalt blue, which is a standard color in the glass industry: "Country Glass cannot make a claim to owning -- ownership to cobalt blue."  Niiler Depo. at p.14, l.21-p.15, l.3; p.45, l.3-p.47, l.1.

36. Country Glass admitted that three out of the five trade dress elements alleged at paragraph 21 of the Amended Complaint served a functional purpose.  The size of the Country

10

Glass sun catcher was a "standard" size to create a larger visual impact. The single hole at the top of the Country Glass sun catcher is for hanging, and the texture of the sun catcher makes the product more brilliant and vivid when the light hits it. Niiler Depo at p.42, ll.5-12; p.44, l.14-19; p.48, l.22-p.49, l.6; p.49, l.22-p.50, l.5.

37. The hydrangea design is a "regional design" and was chosen at the request of a retail customer of Country Glass, Judi Hill, who operates Hill's Gallery in Nantucket, based on what the Hill's Gallery customers wanted. Niiler Depo at p.48, ll.15-21; p.106, l.4-p.107, l.12.

38. Country Glass did not even begin the process of seeking copyright protection for its sun catcher until nearly a year after this lawsuit was filed. Niiler Depo. at p.82, l.17-p.83, l.6.

*Country Glass Sun Catcher Sales*

39. Ninety percent of all Country Glass sun catchers bearing the hydrangea design were sold at Hill's Gallery, a very small gallery in Nantucket. Niiler Depo. at p.14, ll.9-18; p. 17, ll.10-22; Heim Aff. Ex. O.

40. The remaining Country Glass sun catchers were sold on Cape Cod, in Martha's Vineyard, and in Vermont at other specialty stores, including The Glass Eye Gallery, and at Country Glass's own retail store. Heim Aff. Ex. O; Knight Depo. at p.36, ll.11-19.

41. The Country Glass sun catcher retails for $18 to $25. Each year since 1998, Country Glass sold fewer than 300 of the sun catchers at issue, including sales of the Country Glass sun catcher in colors other than cobalt blue. Heim Aff. Ex. O; Niiler Depo. at p.87, ll.15-24.

*The CTS Basket Plate*

42. CTS sold a "basket plate" in 2003 and 2004 for $1.69. Heim Aff. Exs. R, S; Cummings Depo. at p.57, ll.19-24.

11

43. The CTS basket plate was made in China, and its label clearly stated "Made in China" alongside the CTS name and "sleigh" logo.  Cummings Depo. at p.49, l.17-p.50, l.3; Niiler Depo. at p.95, ll.11-16; Heim Aff Ex. DD.

44. CTS sent the Country Glass sun catcher to a vendor in China as a sample.  CTS requested that its product be made with two holes for hanging, but it was produced with only one. Cumming Depo. at p.50, l.8-24; p.61, l.9-p.62, l.7.

*Product Comparison*

45. The Country Glass sun catcher is a lighter color than the CTS basket plate, with rounder pieces of glass forming the basket image and smoother glass leaves, and a flowing edge.  The CTS plate is darker, full of bubbles, more rigid and flat with no flow, has a different weave to the basket, an "orange peel" quality to the glass and a leather strap for hanging.  Niiler Depo. at p.78, l.12-p.80, l.22; Cummings Depo. at p.46, l.17-p.48, l.11; G.Bilezikian Depo. at p.32, l.6-p.33, l.24.

*Country Glass Customers*

46. Country Glass stated that CTS customers "are not the kind of people that come to our shop."  The Country Glass customer appreciates creativity, innovation, and American craftsmanship.  Niiler Depo. at p.91, l.21-p.93, l.3.

47. No Country Glass customer ever mentioned seeing the CTS basket plate.  Country Glass customers have mentioned seeing copies of *other* Country Glass sun catchers, but these customers stated that the quality of those copies was visibly inferior.  Niiler Depo. at p.80, l.23-p.81, l.13 ("They didn't get it.").

48. The CTS basket plate had three qualities -- a rigid and flat appearance, orange peel surface and bubbles in the glass -- that no Country Glass customer would ever associate with a Country Glass product.  Niiler Depo. at p.80, ll.7-22.

49. Country Glass stated that it knows of nobody who would think that the CTS basket plate was in fact made by Country Glass: "They [the CTS basket plates] have a different style." Country Glass does not know of any Country Glass customer who bought the CTS basket plate. Niiler Depo. at p.91, ll.11-16; p.94, 11.15-24.

*Country Glass Advertising and Labeling*

50. The Country Glass sun catcher was never advertised or promoted in print.  Other Country Glass designs sold through the Museum of Fine Arts catalog were described as being "handcrafted in Vermont," and "hand-stamped onto recycled glass by American artisans."  These products were not listed as being Country Glass products, and in one instance are described as "our Museum suncatchers."   Niiler Depo. at p.96, l.3-p.97, l.24; Heim Aff. Ex. P.

51. Country Glass gift boxed the sun catchers it sold, including a Country Glass card inside and a sticky label bearing the Country Glass logo (pictured below) on the outside.  Heim Aff. Ex. Q; Niiler Depo. at p.99, l.19-p.101, l.14.



13

**A<small>UNT</small> S<small>ADIE'S</small>, A<small>UNT</small> S<small>ADIE'S</small> "C<small>ANDLES IN A</small> C<small>AN</small>" & T<small>HE</small> CTS C<small>ANDLE</small> T<small>INS</small>**

*Aunt Sadie's Factory and Retail Business*

52. For the last eight years, plaintiff Aunt Sadie's, Inc. ("Aunt Sadie's") has owned and operated a factory in Boston, where it manufactures only candles. Briggs Depo. at p.5, l.11-p.8, l.15.

53. Aunt Sadie's has sold its candles at its retail store in Boston for the last 5 ½ years, and has also sold its candles nationwide through a website, other retail stores, and a recently opened Aunt Sadie's store in Denver. Aunt Sadie's customers are located all over the country. Briggs Depo. at p.6, ll.16-23; p.10, ll.7-13; p.25, ll.12-21.

54. Aunt Sadie's was named after the grandmother of one of the company's two co-owners. Aunt Sadie's customers know what kind of woman "Aunt Sadie" was because Aunt Sadie's has marketed that information and talked to its customers about her. Briggs Depo. at p.78, ll.6-13.

*Aunt Sadie's "Candles in a Can" Design*

55. Aunt Sadie's sells hundreds of different candles in cans. The distinguishing characteristics of these candles include "the whimsical nature of the labeling" and "[t]he quality of the scent". The size of the label allows Aunt Sadie's to use bigger, more dominant graphics. Heim Aff. Ex. U; Briggs Depo. at p.11, l.21-p.12, l.4; p.16, ll.4-9.

56. Aunt Sadie's began selling an "Apple Pie" candle in 2001, a "Happy Birthday" candle in 2002, and "It's a Boy" and "It's a Girl" candles in 2003. Briggs Depo. at p.31, l.16-p.32, l.3; Heim Aff. Exs. T, U.

57. The name "Aunt Sadie's" and the catchphrase "candles in a can" are trademarked. There is no patent or copyright held on the four Aunt Sadie's candles at issue. Briggs Depo. at p.46, l.17-p.47, l.9.

*"Candles in a Can" Sales*

58. The suggested retail price for most Aunt Sadie's candle designs is $15. None of the Aunt Sadie's candles at issue accounted for more than 3% of Aunt Sadie's candle sales in any given year. Briggs Depo. at p.20, l.24-p.21, l.3; Heim Aff. Ex. U.

*The CTS Candle Tins*

59. In 2005, CTS sold 8-ounce candle tins, with decorative labels stating "Happy Birthday to You," "It's a Boy," and "It's a Girl," for $1.99 each. Laliberte Depo. at p.13, ll.7-9; Heim Aff. Exs. X-Y.

60. The CTS candle tins were made in China, and their labels clearly stated "Made in China," alongside the CTS name and "sleigh" logo. The CTS candle tin labels also said "Nantucket Distributing." Laliberte Depo at p.6, ll.10-18; Briggs Depo. at p.62, ll.14-18.

61. The decorative labels for the CTS candles were chosen based on the success of other CTS birthday- and baby-related items, and the art work was then sent to the manufacturer in China. The size of the candle was determined by what was available at the factory in China. Laliberte Depo. at p.8, ll.11-21; p.11, ll.5-8; p.12, l.18-p.13, l.1.

62. Aunt Sadie's has no knowledge of any intent by CTS to deliberately copy Aunt Sadie's candles. Briggs Depo. at p.72, ll.5-16.

*Product Comparison*

63. Unlike the CTS candles, the Aunt Sadie's candles are highly scented with fragrances such as apple pie, baby powder, and piña colada. The strength of the Aunt Sadie's scent and the quality of the Aunt Sadie's wax are superior to that which is used in the CTS candle tins. The Aunt Sadie's "Happy Birthday" label is decorated with yellow stripes and blue stars, the "Apple Pie" candle has an apple design, and the "It's a Boy" and "It's a Girl" labels are each decorated

with a flower image with a button at the center. Heim Aff. Ex. T; Briggs Depo. at p.64, l.23-p.65, l.21; Laliberte Depo. at p.10, ll.13-22; C.Bilezikian Depo. at p.30, l.23-p.32, l.19.

64. The CTS candles have no scent, use a lower quality paper label, and the quality of the design is not as good as the Aunt Sadie's Candle. The CTS "Happy Birthday to You" label is decorated with cupcakes, balloons, confetti, and the words "Make a Wish;" the CTS "It's a Girl" candle sports an image of alphabet blocks; and the CTS "It's a Boy" candle has a baby rattle design. There is no CTS "Apple Pie" candle. Heim Aff. Ex. X; Briggs Depo. at p.64, l.23-p.65, l.21; Laliberte Depo. at p.10, ll.13-22; C.Bilezikian Depo. at p.30, l.23-p.32, l.19.

*Aunt Sadie's Customers and Their Reaction to the CTS Candle Tins*

65. Aunt Sadie's customers are keen on scents, and seek out realistic or true-to-life fragrances. Briggs Depo. at p.26, ll.9-13.

66. Aunt Sadie's received roughly eight or nine phone calls from customers about the CTS candle tins. Aunt Sadie's recalled that the majority of these conversations were to the effect of: "We see something that looks [like] Aunt Sadie's candles at Christmas Tree Shops." No Aunt Sadie's customer ever said, "We think Aunt Sadie's is making this [the CTS] candle." Briggs Depo. at p.56, l.6-p.57, l.24; p.85, ll.15-18.

67. Aunt Sadie's also received a letter from a retail customer, Carol Wright, stating "We are fans of your creative candles and *non-fans* of the Christmas Tree Shop copycat standards…" This customer did not say anything to lead Aunt Sadie's to believe that she was confused about whether Aunt Sadie's was selling its candles to CTS. Heim Aff. Ex. W; Briggs Depo. at p.59, l.2-p.60, l.12.

68. Aunt Sadie's knows of no Aunt Sadie's customer who actually bought a CTS candle tin. Briggs Depo. at p.58, ll.1-5.

*Aunt Sadie's Advertising and Labeling*

69. The four Aunt Sadie's candles at issue all bear the Aunt Sadie's name somewhere on the label.  All Aunt Sadie's candles bear the Aunt Sadie's name somewhere on the label, with the exception of some "private label" candles.  Briggs Depo. at p.8,11.19-24; p.10, l.14-p.11, l.7.

70. None of these candles was ever included in Aunt Sadie's advertising or promotion in print.  Magazine articles and product features of other Aunt Sadie's candles emphasized the candles' scent and/or local manufacture.  Heim Aff. Ex. V ("Aunt Sadie's is a fixture of the South End," "signature smell… Ocean," "bring the outdoors home," "we make our candles right in our shop here… in the South End," "take the beach home with you," "[w]hisk yourself off to an evening in Paris").

**<u>PLAINTIFF SUSAN BOERMAN AND THE "IT'S GREAT TO CREATE" PLAQUES</u>**

71. Plaintiff Susan Boerman ("Boerman") wrote <u>It's Great to Create</u>, a book which contains designs for a number of craft items, including two plaques called "Frosty's Snow Cones" and "Autumn Harvest."  Amended Complaint ¶14; Heim Aff. Ex. Z.

72. Boerman produced four pages of this book, containing drawings of these two plaques.  Heim Aff. Ex. AA.  Boerman has produced no other documents in this case.

73. CTS sold its allegedly infringing "fall painted plaque" for $3.99 each in 2003 and 2004, and sold its allegedly infringing "painted Xmas hanger" for $1.99 each in 2003.  Heim Aff. Ex. BB.

74. CTS purchased its plaques as-is from a wholesaler's showroom in China.  Watts Depo. p.10, l.23-p.11, l.18; p.17, ll.21-23 ("We were in the factory and we were walking around.  And I picked the fall design and Christmas design off the shelf . . . It was a ready made product.").

75. The CTS plaques were sold with the CTS label bearing CTS's red "sleigh" logo and stating that the items were "Made in China."  G.Bilezikian Depo. at p. 40, l.22-p.41, l.2.

>Respectfully submitted,
>
>**CHRISTMAS TREE SHOPS, INC.**
>
>By its attorneys:
>
>    /s/  Carrie Kei Heim
>Peter A. Biagetti, Esq., BBO# 042310
>Carrie Kei Heim, Esq., BBO# 652147
>MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, PC
>One Financial Center
>Boston, MA  02111
>Tel. 617-542-6000
>Fax 617-542-2241

Dated: May 15, 2006

LIT 1571291v.4