**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

|  |  |  |
|---|---|---|
| JOHN KNIGHT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 04 12698 JLT** |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTMAS TREE SHOPS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

### CHRISTMAS TREE SHOPS, INC.'S PRE-TRIAL STATUS REPORT

Pursuant to the Procedural Order dated June 8, 2006, defendant Christmas Tree Shops, Inc. ("CTS"), respectfully submits this status report addressing the issues identified by the Court.[1]

#### A.  Summary of the Evidence with Respect to Liability and Damages

The evidence will show that plaintiffs' products are not protectible under trade dress law because they have not acquired secondary meaning.  Specifically, CTS anticipates that the evidence will show that the plaintiffs' products were not on the market for very long, were not central to plaintiffs' product lines, were not advertised or promoted, did not have an established place in the market due to plaintiffs' limited consumer base, and that no efforts were made to promote a conscious connection by the public between the trade dress and the product's source. The evidence will also show that CTS did not have any intent to "pass off" its products as originating with the plaintiffs.  The evidence will also show that multiple features of the trade dresses claimed by  plaintiffs Country Glass and Aunt Sadie's, Inc. are functional.

---

[1] On Friday, July 21, 2006, the parties entered into an agreement in principle which, if executed, should settle all claims alleged by Susan Boerman by September 1, 2006.  Accordingly, the claims alleged against CTS by Ms. Boerman have not been addressed in this report.  The parties have additionally agreed to submit the remaining claims to one day of non-binding mediation, to be completed prior to September 1, 2006.

Additionally, the evidence will show that plaintiffs' alleged trade dresses were not infringed because there was no likelihood of confusion between plaintiffs' products and the CTS products. Specifically, CTS anticipates that the evidence will show: that there was minimal similarity of the trade dress due to the visible inferiority of the CTS products and clear differences in pricing, labeling and packaging; that there was minimal similarity of goods and services because CTS provides customers with bargain shopping over a great range of products, while plaintiffs provide a limited range of high-end handmade crafts; that CTS and the plaintiffs have very different channels of trade, channels of advertising, and class of prospective customer because CTS stores are much larger (both in size and in the range of merchandise) and CTS seeks to sell to bargain hunters rather than to the discerning handmade crafts buyer; that there is little if any actual confusion (and that the Glass Eye plaintiffs' survey does not support a finding of confusion); that CTS had no intent to confuse in adopting the design and appearance of its products; and that the strength of plaintiffs' claimed trade dresses are weak, to the extent any protectible trade dress exists at all. This evidence will also show no liability as to the claims of unfair competition.

The evidence will also set forth CTS's and plaintiffs' sales and profits, if any, relating to the allegedly infringing products, to the extent it is necessary to evaluate damages.

**B.  Facts Established By Pleadings, Stipulations, or Admissions of Counsel**

Pursuant to Local Rule 56.1, CTS filed a Consolidated Statement of Facts in support of its Motion for Summary Judgment. In their Opposition to the Motion for Summary Judgment ("Opposition"), plaintiffs disputed only one factual allegation, to wit, that the building that houses the Glass Eye Gallery is not part residence. See Opposition at p.4. Accordingly, CTS hereby attaches its Consolidated Statement of Facts as Exhibit A, and incorporates the Statement

by reference, with the exception of this disputed fact found at paragraph 2, and summarizes those established facts as follows:

*Glass Eye and the Sconces*

Plaintiffs John Knight and Donna Russell Knight d/b/a The Glass Eye Gallery (collectively "Glass Eye") have been in the business of making glass creations for 35 years. Glass Eye owns a gallery on Cape Cod, with approximately 1,000 feet of selling space. This gallery sells blown and stained glass, pottery, and other crafts made by American artisans. Glass Eye only sells locally handcrafted products, for discriminating shoppers. All stained glass items sold at the gallery are designed and made by Glass Eye.

In 1992, Glass Eye began designing, making and selling versions of an opalescent glass wall sconce intended to hold dried flowers. The sconce was never included in any Glass Eye advertising or otherwise publicly promoted. Glass Eye estimated that between 1,200 and 1,400 sconces were sold at the gallery from 2001 to 2003. Glass Eye sold the sconce at a full retail price of $32.95 until its discontinuation in early May of 2003.

CTS has close to 30 stores, each as big as 50,000 feet, located primarily in the New England area. CTS carries a great range of merchandise, emphasizing bargain sales, and buys thousands of items, often from vendors in China. The CTS sconce sold for $1.99 in 2003, and was reduced to $1.00 in 2004. It was made in China, and the label clearly stated "Made in China" alongside the CTS name and "sleigh" logo. CTS sent the Glass Eye sconce to a vendor in China as a sample, but never instructed the manufacturer to copy the item directly. CTS later chose the colors for the CTS sconce based on its buyer's personal preferences.

The CTS sconce is inferior to the Glass Eye sconce in craftsmanship and appearance. The Glass Eye sconce is solid, framed in copper that has an almost black color, has superior

3

soldering and seaming with nice quality glass and is more delicate. The CTS sconce does not have the look of being handmade, is not solid, has inferior construction that can be pulled apart, is framed in a more square textured soft lead with a light gray color, is thinner, and has a ribbon hanger. Glass Eye never advertised the features of its claimed trade dress, and admitted that unless a person were already an educated Glass Eye customer who had previously seen the wall sconce in Glass Eye's store, none of the trade dress elements alleged by plaintiffs would be recognizable as an indicator of source.

*Country Glass and the Sun Catchers*

Plaintiffs Charles Cole, Viiu Niiler and Country Glass Shop (collectively, "Country Glass") have designed, manufactured and sold glassworks from their Vermont factory for 30 years. Located in a 150 year old farmhouse on a back road, the Country Glass retail store is open during the summer for 16 weeks out of every year. Country Glass also sells its creations to specialty retailers, some of whom have been Country Glass customers for decades. Country Glass customers appreciate American crafts and the handmade quality of Country Glass products.

In 1998, Country Glass designed, made and sold a cobalt blue sun catcher bearing an image of a "Nantucket basket" filled with hydrangeas. The hydrangea design was chosen at the request of a retail customer, Judi Hill, who operates Hill's Gallery in Nantucket, and 90% of all Country Glass sun catchers bearing this design were sold at Hill's Gallery. The remaining sun catchers were sold at other specialty retail stores, including The Glass Eye Gallery, and at Country Glass' own retail store. The sun catcher was also produced in a number of other colors, none of which were as popular as the cobalt blue, which is a standard color in the glass industry. The sun catcher retails for $18 to $25, and was never featured in any Country Glass advertising.

The CTS sun catcher sold in 2003 and 2004 for $1.69. It was also made in China, as the label clearly stated, alongside the CTS name and "sleigh" logo. CTS sent the Country Glass sun catcher to a vendor in China as a sample, and requested that the CTS sun catcher be made with two holes for hanging, but it was produced with only one.

The Country Glass sun catcher is a lighter color, with rounder pieces of glass forming the basket image and smoother glass leaves, an oval shape and flowing edge. The CTS sun catcher is darker, full of bubbles, more rigid and flat with no flow, has a different weave to the basket, an "orange peel" quality to the glass and a leather strap for hanging. Country Glass never advertised the features of its claimed trade dress, admitted that many features of its sun catcher were functional, and denied that anyone would mistake the CTS sun catcher for Country Glass's work.

*Aunt Sadie's and the Candles*

For the last eight years, plaintiff Aunt Sadie's, Inc. ("Aunt Sadie's") has owned and operated a candle factory in Boston, where it manufactures "candles in a can." Aunt Sadie's has sold its candles at its retail store in Boston for the last 5 ½ years, and has also sold its candles nationwide through website and other retail stores, and has recently opened a store in Denver. Aunt Sadie's candles retail for $15, and Aunt Sadie's customers are keen on scents, and seek out realistic or true-to-life fragrances.

Aunt Sadie's began selling "Apple Pie" candles in 2001, "Happy Birthday" candles in 2002, and "It's a Boy" and "It's a Girl" candles in 2003. None of these candles was ever featured in Aunt Sadie's advertising or other print promotion. These candles all bear the Aunt Sadie's name somewhere on the label. The name "Aunt Sadie's" and the catchphrase "candles in a can" are trademarked.

CTS sold 8-ounce candle tins with labels stating "Happy Birthday to You," "It's a Boy," and "It's a Girl" in 2005 for $1.99. They were made in China, and the labels clearly stated this, alongside the CTS name and "sleigh" logo. The labels for the CTS candles were chosen based on the success of other CTS birthday- and baby-related items, and the art work was then sent to the manufacturer in China. The size of the candle was determined by what was available at the factory in China.

Unlike the CTS candles, the Aunt Sadie's candles are highly scented with fragrances such as apple pie, baby powder, and piña colada. The Aunt Sadie's "Happy Birthday" label is decorated with yellow stripes and blue stars, the "Apple Pie" candle has an apple design, and the "It's a Boy" and "It's a Girl" labels are each decorated with a flower image with a button at the center. The CTS candles have no scent, and use a lower quality paper label. The CTS "Happy Birthday to You" label is decorated with cupcakes, balloons, confetti, and the words "Make a Wish," the CTS "It's a Girl" candle sports an image of alphabet blocks, and the CTS "It's a Boy" candle has a baby rattle design. There is no CTS "Apple Pie" candle.

*Boerman and the "It's Great to Create" Plaques*

The parties have signed an agreement in principle to settle these claims.

**C. Contested Issues of Fact**

CTS contends that Plaintiffs' products do not have secondary meaning, that CTS's products do not cause confusion in the marketplace, and that CTS did not have any intent to "pass off" its own products as Plaintiffs' products.

**D. Jurisdictional Questions**

There are no contested issues of personal or subject matter jurisdiction.

### E.  **Questions Raised By Pending Motions**

There are no pending motions.

### F.  **Issues of Law, Including Evidentiary Questions, with Supporting Authority**

CTS will object to testimony regarding consumer confusion and consumer association to the extent that such anecdotal testimony is hearsay.  Any accounts of third-party confusion or association, to the extent they are "offered in evidence to prove the truth of the matter asserted" (that such parties were, in fact, confused or associated plaintiffs' products with the plaintiffs as their source) should not be admissible at trial.  See Fed. R. Evid. 801; cf. Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1333 (8th Cir. 1985) (reversing the district court's finding of secondary meaning: "More is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff that some of his customers were confused.").

CTS additionally will object to the competency of the consumer survey and survey report of plaintiffs John Knight and Donna Russell Knight, and will object to any testimony related to the survey and report.  The survey and report are deeply flawed, and accordingly any testimony relating to the survey and report is inadmissible under Fed. R. Evid. 702, requiring that any expert testimony be "based on sufficient facts or data" and "the product of reliable principles and methods."  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993) (holding that a trial judge must examine expert testimony critically to ensure that it is both reliable and relevant before admitting it).  To the extent that such evidence is deemed admissible, CTS will request that the jury be instructed not to accord the evidence any weight.  See Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477, 488 (5th Cir. 2004) (survey not admissible when it was "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the

likelihood of consumer confusion."); Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., 19 F.3d 125, 134 (3rd Cir. 1994) (survey results are not credible if the survey relies on leading questions which are "inherently suggestive and invite guessing by those who did not get any clear message at all."); American Footwear Corp. v. General Footwear Co. Ltd., 609 F.2d 655, 660 n.4 (2d Cir. 1979) (affirming district court's "rejection" of consumer surveys in light of "self-serving" questions and failure to conduct survey under "actual marketing conditions"); Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130, 138 (D. Mass. 2003) (survey "would not be helpful to a jury… because the survey suggested to the respondent that the products *did* come from a single manufacturer."); Simon Property Group L.P. v. MySimon, Inc., 104 F. Supp. 2d 1033, 1038, 1041 (S.D. Ind. 2000) (excluding surveys where flaws were so fundamental as to "strip the proposed survey of any significant probative value"); Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1465 (D. Kan. 1996) (finding defects so significant as to render surveys inadmissible); Exxon Corp. v. XOIL Energy Res., Inc., 552 F. Supp. 1008, 1021-22 (S.D.N.Y. 1981) (confusion survey evidence afforded "no weight" because, "[o]nly 97 respondents were interviewed…and all of the interviewees came from the vicinity of [one city]."); General Motors Co. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 738 (W.D. Mich. 1964) (consumer surveys criticized because interviewers improperly categorized inconclusive responses); Oneida, Ltd. v. National Silver Co., 25 N.Y.S.2d 271, 286 (N.Y. Sup. Ct. 1940) (surveys conducted in parties' own home towns found biased and accorded no weight); J. Gilson, Trademark Protection and Practice § 8.11 (2006) (a survey's reliability "depends on whether (1) the sample tested is representative of the relevant consuming public; (2) the sample is numerically relevant; (3) the questions were posed so as to avoid bias; (4) the methodology was scientifically valid and was developed by experts; (5) the

interviewers were unaware of the litigation; and (6) the survey is supported at trial by expert testimony").

### G. Requested Amendments to the Pleadings

There are no requested amendments to the pleadings.

### H. Additional Matters to Aid in the Disposition of the Action

At this time, CTS is unaware of any additional matters that will aid in the disposition of the action.

### I. Probable Length of Trial

Trial is currently scheduled to commence on Monday, October 30, 2006, and it is expected by counsel for all parties that the trial will last no longer than 3 to 5 days.

### J. Names of Witnesses to be Called

CTS anticipates that it will call the following witnesses:

(1) Greg Bilezikian;
(2) Gary Briggs;
(3) Carolyn Cummings;
(4) John Knight;
(5) Janice Laliberte; and
(6) Viiu Niiler.

### K. Proposed Exhibits

CTS anticipates that it will introduce at trial documents previously attached as exhibits to the Affidavit of Carrie Kei Heim in Support of CTS's Motion for Summary Judgment and the Affidavit of Carrie Kei Heim in Support of CTS's Motion to Strike the Survey and Report of Plaintiffs John Knight and Donna Russell Knight as exhibits at trial.  A summary list of these exhibits is attached hereto as Exhibit B.  CTS may supplement those documents with documents reflecting more recent sales data from plaintiffs or CTS to the extent such data exists, and/or any

other belatedly produced discovery by plaintiffs.  CTS will also introduce into evidence the

products at issue in this case, if they are not previously introduced by plaintiffs.

Respectfully submitted,

**CHRISTMAS TREE SHOPS, INC.**

By its attorneys:

     /s/  Carrie Kei Heim
Peter A. Biagetti, Esq., BBO# 042310
Carrie Kei Heim, Esq., BBO# 652147
MINTZ, LEVIN, COHN, FERRIS,
   GLOVSKY AND POPEO, PC
One Financial Center
Boston, MA  02111
Tel. 617-542-6000
Fax 617-542-2241

Dated: July 24, 2006

LIT 1579373v.2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                              )
JOHN KNIGHT, DONNA RUSSELL          )
KNIGHT d/b/a THE GLASS EYE            )
GALLERY, CHARLES COLE, VIIU           )
NIILER, COUNTRY GLASS SHOP,          )
AUNT SADIE'S, INC., AND SUSAN        )
BOERMAN,                                       )
                                              )
        Plaintiffs,                          )        **Case No. 04 12698 JLT**
                                              )
v.                                            )
                                              )
CHRISTMAS TREE SHOPS, INC.,          )
                                              )
        Defendant.                           )
_____)

<u>**CONSOLIDATED STATEMENT OF FACTS IN SUPPORT OF
CHRISTMAS TREE SHOPS, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

        Pursuant to Local Rule 56.1, the undisputed facts on which defendant Christmas Tree

Shops, Inc. ("CTS") relies in support of its Motion for Summary Judgment are specified below.

As to each fact, the statement refers to a specific portion of the record where the fact may be

found.  Documents and deposition testimony supporting these factual statements are attached as

exhibits to the <u>Affidavit of Carrie Kei Heim</u> (filed herewith).

<u>**INDEX OF EXHIBITS**</u>

<u>**DEPOSITION EXCERPTS**</u>

        1.   Deposition of Carolyn Cummings on behalf of CTS, dated September 23, 3005

(hereinafter "Cummings Depo.").  <u>See</u> Affidavit of Carrie Kei Heim (hereinafter "Heim Aff.") at

¶2 and Ex. A.

2.     Deposition of Gregory Bilezikian on behalf of CTS, dated November 8, 2005 (hereinafter "G.Bilezikian Depo."). <u>See</u> Heim Aff. at ¶3 and Ex. B.

3.     Deposition of Janice Laliberte on behalf of CTS, dated November 8, 2005 (hereinafter "Laliberte Depo."). <u>See</u> Heim Aff. at ¶4 and Ex. C.

4.     Deposition of Deborah Watts on behalf of CTS, dated November 8, 2005 (hereinafter "Watts Depo."). <u>See</u> Heim Aff. at ¶5 and Ex. D.

5.     Glass Eye Gallery 30(b)(6) Deposition (John Knight), dated November 9, 2005 (hereinafter "Knight Depo."). <u>See</u> Heim Aff. at ¶6 and Ex. E.

6.     Aunt Sadie's, Inc. 30(b)(6) Deposition (Gary Briggs), dated November 9, 2005 (hereinafter "Briggs Depo."). <u>See</u> Heim Aff. at ¶7 and Ex. F.

7.     Country Glass Shop 30(b)(6) Deposition (Viiu Niiler), dated November 10, 2005 (hereinafter "Niiler Depo."). <u>See</u> Heim Aff. at ¶8 and Ex. G.

8.     Deposition of Charles Bilezikian on behalf of CTS, dated February 7, 2006 (hereinafter "C.Bilezikian Depo."). <u>See</u> Heim Aff. at ¶9 and Ex. H.

### <u>D</u>OCUMENTS

1.     Drawing and photo of the "sconce" described at paragraph 20 of the Amended Complaint (hereinafter "Glass Eye sconce"). <u>See</u> Heim Aff. at ¶10 and Ex. I.

2.     Sales numbers for the Glass Eye sconce. <u>See</u> Heim Aff. at ¶11 and Ex. J

3.     Glass Eye advertising. <u>See</u> Heim Aff. at ¶12 and Ex. K.

4.     Glass Eye logo and product labels. <u>See</u> Heim Aff. at ¶13 and Ex. L.

5.     Sales records for the allegedly infringing CTS "wall vase." <u>See</u> Heim Aff. at ¶14 and Ex. M.

6.  Photo of the "grape plate" described at paragraph 21 of the Amended Complaint (hereinafter "Country Glass Sun Catcher").  <u>See</u> Heim Aff. at ¶15 and Ex. N.

7.  Sales numbers for the Country Glass Sun Catcher.  <u>See</u> Heim Aff. at ¶16 and Ex. O.

8.  Museum of Fine Arts catalog pages containing Country Glass products.  <u>See</u> Heim Aff. at ¶17 and Ex. P.

9.  Country Glass logo and product labels.  <u>See</u> Heim Aff. at ¶18 and Ex. Q.

10. Photos of the allegedly infringing CTS "basket plate hanger."  <u>See</u> Heim Aff. at ¶19 and Ex. R.

11. Sales records for the CTS basket plate hanger.  <u>See</u> Heim Aff. at ¶20 and Ex. S.

12. Photos of the "Candles in a Can" described at paragraph 22 of the Amended Complaint (hereinafter "Aunt Sadie's Apple Pie, Happy Birthday, It's a Boy and It's a Girl Candles").  <u>See</u> Heim Aff. at ¶21 and Ex. T.

13. Sales numbers for the Aunt Sadie's Apple Pie, Happy Birthday, It's a Boy and It's a Girl Candles.  <u>See</u> Heim Aff. at ¶22 and Ex. U.

14. Aunt Sadie's magazine promotions.  <u>See</u> Heim Aff. at ¶23 and Ex. V.

15. Letter from Aunt Sadie's co-owner Gary Briggs to CTS, and attached letter from an Aunt Sadie's customer.  <u>See</u> Heim Aff. at ¶24 and Ex. W.

16. Label designs for the allegedly infringing CTS "candle tins."  <u>See</u> Heim Aff. at ¶25 and Ex. X.

17. Sales records for the CTS candle tins.  <u>See</u> Heim Aff. at ¶26 and Ex. Y.

18. Front cover of the 29-page book, "It's Great to Create" by Susan R. Boerman, described at paragraph 14 of the Amended Complaint.  <u>See</u> Heim Aff. at ¶27 and Ex. Z.

19. "It's Great to Create" pages 20-21 and 24-25.  <u>See</u> Heim Aff. at ¶28 and Ex. AA.

20. Sales records for the allegedly infringing CTS "painted Christmas hanger" and "fall painted plaque."  <u>See</u> Heim Aff. at ¶29 and Ex. BB.

21. CTS advertising flyer.  <u>See</u> Heim Aff. at ¶30 and Ex. CC.

22. CTS price labels.  <u>See</u> Heim Aff. at ¶31 and Ex. DD.


<u>STATEMENT OF FACTS</u>

<u>GLASS EYE, THE GLASS EYE SCONCE AND THE CTS WALL VASE</u>

*The Glass Eye Gallery*

1.  The Glass Eye Gallery is co-owned by Plaintiffs John Knight and Donna Russell Knight (collectively, "Glass Eye").  Glass Eye has been in the business of making glass creations for 35 years.  Knight Depo. at p.6, l.18-p.7, l.5.

2.  The building that houses the Glass Eye Gallery is a Cape Cod house that is a combination gallery and residence.  The gallery portion of this building has approximately 950-1000 square feet of selling space.  Knight Depo. at p.7, l.8-p.9, l.9.

3.  The Glass Eye Gallery sells blown and stained glass, pottery, fused glass, among other crafts made in North America.  Approximately 16 different styles of glass items were sold at The Glass Eye Gallery in 2002 and 2003, including candle holders, stained glass boxes, lamps, small panels, mirrors, wall sconces, and a variety of decorative and functional items.  Glass Eye makes all the stained glass items sold at the gallery.  Knight Depo. at p.13, l.21-p.14, l.3; p.14, ll.22-24; p.16, ll.3-11; p.17, ll.14-17; p.60, ll.19-22; p.87, l.21-p.88, l.1.

*The Glass Eye Sconce Design*

4.    Glass Eye has made and sold a variety of glass wall sconces since 1992.  Their primary purpose is to hang dry or live flower arrangements.  Knight Depo. at p.40, ll.14-24; p.42, ll.21-23.

5.    John and Donna Knight designed and made an opalescent glass wall sconce which they sold at The Glass Eye Gallery (hereinafter "the Glass Eye sconce").  Heim Aff. Ex. I; Knight Depo. at p.11, l.20-p.12, l.9; p.77, ll.13-20.

6.    The colors of the Glass Eye sconce were chosen based on the popularity of other items in the Glass Eye Gallery, and based on John Knight's monitoring of popular trends.  Knight Depo. at p.77, ll.21-24; p.78, ll.5-21; p.80, l.22-p.81, l.3.

7.    There is no patent or copyright held on the Glass Eye sconce.  Knight Depo. at p.81, ll.4-9.

8.    The primary way a consumer would know that the Glass Eye sconce originated with and was created by Glass Eye was the fact that the item was sold in The Glass Eye Gallery.  The general consuming public had no way of recognizing a Glass Eye design if they had not previously seen the products in The Glass Eye Gallery.  None of the trade dress elements attributed to the Glass Eye sconce in paragraph 20 of the Amended Complaint is recognizable as being part of a Glass Eye design unless the consumer has been educated about Glass Eye's work and products.  Knight Depo. at p.59, l.20-p.62, l.1; p.62, l.3-p.63, l.12; p.76, l.21-p.77, l.12.

9.    No customer has ever spoken to John Knight about any of the features of the Glass Eye sconce that they might find distinctive.  Knight Depo. at p.65, ll.14-22.

*Glass Eye Sconce Sales*

10. More than 1,000 Glass Eye sconces were sold at the Glass Eye Gallery from 2001 to 2003.  Knight Depo. at p.97, l.19-p.98, l.24.

11. In 2002, thirty-six percent of Glass Eye's glass sales were attributable to sales of the Glass Eye sconce at issue in this case.  In 2002, the Glass Eye sconce was sold for $31.95 or $32.95.  Knight Depo. at p.16, l.16-p.17, l.11; p.21, ll.15-17; Heim Aff. Ex. J.

12. Approximately twenty Glass Eye sconces sold at their full price of $32.95 between January and April of 2003.  Glass Eye discontinued the manufacture and regular retail sale of the Glass Eye sconce in early May 2003.  Glass Eye sold the twelve sconces remaining in stock after discontinuation at its annual sale in October 2003.  Knight Depo. at p.17, l.14-p.18, l.12; p.20, l.11-p.21, l.14.

*CTS and the CTS Wall Vase*

13. CTS has approximately 30 stores, each as big as 50,000 square feet, primarily located in the New England area.  CTS carries a great range of merchandise, emphasizing bargain sales in its advertising, and buys thousands of items, often from vendors in China.  C.Bilezikian Depo. at p.13, ll.15-18; p.17, ll.6-8; Heim Aff. Ex. CC.

14. CTS sold a "wall vase" for $1.99 in 2003, and the price was reduced to $1.00 in 2004.  Heim Aff. Ex. M; Cummings Depo. at p.41, ll.1-19.

15. The CTS wall vase was made in China, and its label (pictured below) clearly stated "Made in China" alongside the CTS name and CTS's "sleigh" logo.  Cummings Depo. at p.35, ll.11-13; Knight Depo. at p.47, ll.4-16; p.57, l.21-p.58, l.1; p.58, ll.10-20; Heim Aff. Ex. DD.



16. CTS sent the Glass Eye sconce to a vendor in China as a sample, but never instructed the manufacturer to copy the item directly.  CTS later chose the colors for the CTS wall vase based on its buyer's personal preferences.  Cummings Depo. at p.28, ll.6-15; p.34, ll.10-20.

17. CTS visits shows and vendors looking for trends, such as popular colors and ideas that are fresh, and may use new items on the market for inspiration.  Cummings Depo. at p.11, l.16-p.13, l.17.

*Product Comparison*

18. The CTS wall vase is inferior to the Glass Eye sconce in craftsmanship and appearance. The Glass Eye sconce is solid, framed in copper that has an almost black appearance, has superior soldering and seaming with nice quality glass and is delicate.  The CTS wall vase does not have the look of being handmade, is not solid, has inferior construction that can be pulled apart, is framed in a more square textured soft lead with a light gray color, is thinner, and has a ribbon hanger.  Knight Depo. at p.48, l.9-p.50, l.24; C.Bilezikian Depo. at p.28, l.4-p.29, l.6; G.Bilezikian Depo. at p.23, l.20-p.28, l.2; Cummings Depo. at p.28, l.19-p.30, l.19.

19. "The price tag" of the CTS wall vase is another indication that the CTS wall vase was of lower quality and inferior craftsmanship than the Glass Eye sconce.  Knight Depo. at p.51, ll.8-23.

*Glass Eye Customers and Their Reaction to the CTS Wall Vase*

20. The target market for Glass Eye products is a sophisticated customer who knows and appreciates discriminating crafts from American artisans.  Glass Eye is not interested in

attracting the average CTS customer: "We are not looking for bargain-hunters. We are not looking for people who are interested in lesser-quality items." Knight Depo. at p.86, l.23-p.87, l.4; p.92, l.8-p.93, l.19; G.Bilezikian Depo. at p.26, ll.1-7.

21. A number of Glass Eye customers and employees said that they had seen a version of the Glass Eye sconce at CTS. Knight Depo. at p.18, l.15-p.20, l.1; p.27, l.10-p.28, l.20.

22. Some of these customers recognized that the CTS version was a "copy," while others asked John Knight if he had sold the Glass Eye design to CTS. Knight Depo. at p.27, ll.14-19.

23. The customers who recognized that the CTS version was a "copy" did so because they were accustomed to buying "only quality handcrafts" and sought out galleries like The Glass Eye for these purchases. As John Knight explained, "I believe my customers are discriminating enough to recognize my work." Knight Depo. at p.28, l.24-p.29, l.8; p.30, ll.1-14; p.32, ll.12-13.

24. Only one Glass Eye customer is known to have bought the CTS wall vase. This customer stated that she used to buy the Glass Eye sconce until she discovered she could buy the CTS wall vase for only $1.99. Knight Depo. at p.34, l.3-p.35, l.14.

25. John Knight displayed the Glass Eye sconce and the CTS wall vase side-by-side behind the sales counter at The Glass Eye Gallery starting in 2004 or 2005. The display was intended to invite questions from customers about the two versions of the wall sconce. The CTS wall vase was labeled "Produced by the Christmas Tree Shop" and the Glass Eye sconce was labeled "The Glass Eye." Knight Depo. at p.35, l.15-p.36, l.10; p.37, l.7-p.38, l.5.

26. The customer who stated that she bought the CTS wall vase asked if she could purchase the CTS sconce that John Knight had on display at The Glass Eye Gallery. She was informed that it was on display because it was a copy of the Glass Eye sconce. The customer replied, "I know. I used to purchase yours here, until I found I could buy them for $1.99, and they don't

8

have them anymore, and I want one more, and I see that one.  Can I buy it?"  She was informed

that it was not for sale.  Knight Depo. at p.34, ll.11-19.

27. Glass Eye stated that as many as 20 customers asked if Glass Eye had sold its design to

CTS, but was unable to provide any other examples of consumers who were confused between

the two sconces, or Glass Eye customers who purchased the CTS wall vase.  Knight Depo. at

p.31, ll.6-11; p.67, l.12-p.68, l.1.

*Glass Eye Advertising, Labeling, and Packaging*

28. The Glass Eye sconce was never included in any advertising or promotion in print.  Glass

Eye advertising generally features a single product or image with no prices.  Knight Depo. at

p.82, ll.16-21; Heim Aff. Ex. K.

29. Some of the Glass Eye sconces had a hang-tag that bore the Glass Eye logo (pictured

below), and identified the item as being made by Donna and John Knight.  Knight Depo. at p.89,

ll.3-18; Heim Aff. Ex. L.



30. The Glass Eye Gallery gift boxed 99.9% of its products, including the Glass Eye sconce,

upon purchase.  The gift wrapping was distinctive, including a box with the Glass Eye logo,

high-quality sea green wrapping paper, ribbon, and a distinctive "fu-fu" tissue paper flower

associated with the Glass Eye Gallery.  Purchased items were placed in a Glass Eye bag bearing an enlarged version of a portion of the Glass Eye logo.  Knight Depo. at p.89, l.22-p.92, l.7.

## COUNTRY GLASS, THE COUNTRY GLASS SUN CATCHER & THE CTS BASKET PLATE

### *The Country Glass Factory and Store*

31. Plaintiffs Charles Cole, Viiu Niiler and Country Glass Shop (collectively, "Country Glass") have designed, manufactured and sold glassworks from their Vermont factory for 30 years.  Niiler Depo. at p.5, ll.8-14; p.8, ll.1-13.

32. Located in a 150-year-old farmhouse on a back road, the Country Glass retail store is open during the summer for 16 weeks out of every year.  Niiler Depo. at p.6, l.11-p.7, l.20.

33. Country Glass also sells its creations to specialty retailers, some of whom have been Country Glass customers for decades.  Country Glass customers appreciate American crafts and the handmade quality of Country Glass products.  Niiler Depo. at p.19, l.22-p.21, l.16; p.24, l.3-p.26, l.4.

### *The Country Glass Sun Catcher Design*

34. In 1998, Country Glass designed, made and sold a cobalt blue sun catcher bearing an image of a "Nantucket basket" filled with hydrangeas.  Heim Aff. Ex. N; Niiler Depo. at p.13, l.22-p.14, l.8; p.103, ll.16-23.

35. The mold used for the sun catcher is also used to make small plates and cheese servers. The sun catcher was produced in six other colors, none of which were as popular as the cobalt blue, which is a standard color in the glass industry: "Country Glass cannot make a claim to owning -- ownership to cobalt blue."  Niiler Depo. at p.14, l.21-p.15, l.3; p.45, l.3-p.47, l.1.

36. Country Glass admitted that three out of the five trade dress elements alleged at paragraph 21 of the Amended Complaint served a functional purpose.  The size of the Country

Glass sun catcher was a "standard" size to create a larger visual impact. The single hole at the top of the Country Glass sun catcher is for hanging, and the texture of the sun catcher makes the product more brilliant and vivid when the light hits it. Niiler Depo at p.42, ll.5-12; p.44, l.14-19; p.48, l.22-p.49, l.6; p.49, l.22-p.50, l.5.

37. The hydrangea design is a "regional design" and was chosen at the request of a retail customer of Country Glass, Judi Hill, who operates Hill's Gallery in Nantucket, based on what the Hill's Gallery customers wanted. Niiler Depo at p.48, ll.15-21; p.106, l.4-p.107, l.12.

38. Country Glass did not even begin the process of seeking copyright protection for its sun catcher until nearly a year after this lawsuit was filed. Niiler Depo. at p.82, l.17-p.83, l.6.

*Country Glass Sun Catcher Sales*

39. Ninety percent of all Country Glass sun catchers bearing the hydrangea design were sold at Hill's Gallery, a very small gallery in Nantucket. Niiler Depo. at p.14, ll.9-18; p. 17, ll.10-22; Heim Aff. Ex. O.

40. The remaining Country Glass sun catchers were sold on Cape Cod, in Martha's Vineyard, and in Vermont at other specialty stores, including The Glass Eye Gallery, and at Country Glass's own retail store. Heim Aff. Ex. O; Knight Depo. at p.36, ll.11-19.

41. The Country Glass sun catcher retails for $18 to $25. Each year since 1998, Country Glass sold fewer than 300 of the sun catchers at issue, including sales of the Country Glass sun catcher in colors other than cobalt blue. Heim Aff. Ex. O; Niiler Depo. at p.87, ll.15-24.

*The CTS Basket Plate*

42. CTS sold a "basket plate" in 2003 and 2004 for $1.69. Heim Aff. Exs. R, S; Cummings Depo. at p.57, ll.19-24.

43. The CTS basket plate was made in China, and its label clearly stated "Made in China" alongside the CTS name and "sleigh" logo.  Cummings Depo. at p.49, l.17-p.50, l.3; Niiler Depo. at p.95, ll.11-16; Heim Aff Ex. DD.

44. CTS sent the Country Glass sun catcher to a vendor in China as a sample.  CTS requested that its product be made with two holes for hanging, but it was produced with only one. Cumming Depo. at p.50, l.8-24; p.61, l.9-p.62, l.7.

*Product Comparison*

45. The Country Glass sun catcher is a lighter color than the CTS basket plate, with rounder pieces of glass forming the basket image and smoother glass leaves, and a flowing edge.  The CTS plate is darker, full of bubbles, more rigid and flat with no flow, has a different weave to the basket, an "orange peel" quality to the glass and a leather strap for hanging.  Niiler Depo. at p.78, l.12-p.80, l.22; Cummings Depo. at p.46, l.17-p.48, l.11; G.Bilezikian Depo. at p.32, l.6-p.33, l.24.

*Country Glass Customers*

46. Country Glass stated that CTS customers "are not the kind of people that come to our shop."  The Country Glass customer appreciates creativity, innovation, and American craftsmanship.  Niiler Depo. at p.91, l.21-p.93, l.3.

47. No Country Glass customer ever mentioned seeing the CTS basket plate.  Country Glass customers have mentioned seeing copies of *other* Country Glass sun catchers, but these customers stated that the quality of those copies was visibly inferior.  Niiler Depo. at p.80, l.23-p.81, l.13 ("They didn't get it.").

48. The CTS basket plate had three qualities -- a rigid and flat appearance, orange peel surface and bubbles in the glass -- that no Country Glass customer would ever associate with a Country Glass product.  Niiler Depo. at p.80, ll.7-22.

49. Country Glass stated that it knows of nobody who would think that the CTS basket plate was in fact made by Country Glass: "They [the CTS basket plates] have a different style." Country Glass does not know of any Country Glass customer who bought the CTS basket plate. Niiler Depo. at p.91, ll.11-16; p.94, 11.15-24.

*Country Glass Advertising and Labeling*

50. The Country Glass sun catcher was never advertised or promoted in print.  Other Country Glass designs sold through the Museum of Fine Arts catalog were described as being "handcrafted in Vermont," and "hand-stamped onto recycled glass by American artisans."  These products were not listed as being Country Glass products, and in one instance are described as "our Museum suncatchers."    Niiler Depo. at p.96, l.3-p.97, l.24; Heim Aff. Ex. P.

51. Country Glass gift boxed the sun catchers it sold, including a Country Glass card inside and a sticky label bearing the Country Glass logo (pictured below) on the outside.  Heim Aff. Ex. Q; Niiler Depo. at p.99, l.19-p.101, l.14.



13

## AUNT SADIE'S, AUNT SADIE'S "CANDLES IN A CAN" & THE CTS CANDLE TINS

*Aunt Sadie's Factory and Retail Business*

52. For the last eight years, plaintiff Aunt Sadie's, Inc. ("Aunt Sadie's") has owned and operated a factory in Boston, where it manufactures only candles.  Briggs Depo. at p.5, l.11-p.8, l.15.

53. Aunt Sadie's has sold its candles at its retail store in Boston for the last 5 ½ years, and has also sold its candles nationwide through a website, other retail stores, and a recently opened Aunt Sadie's store in Denver.  Aunt Sadie's customers are located all over the country.  Briggs Depo. at p.6, ll.16-23; p.10, ll.7-13; p.25, ll.12-21.

54. Aunt Sadie's was named after the grandmother of one of the company's two co-owners.  Aunt Sadie's customers know what kind of woman "Aunt Sadie" was because Aunt Sadie's has marketed that information and talked to its customers about her.  Briggs Depo. at p.78, ll.6-13.

*Aunt Sadie's "Candles in a Can" Design*

55. Aunt Sadie's sells hundreds of different candles in cans.  The distinguishing characteristics of these candles include "the whimsical nature of the labeling" and "[t]he quality of the scent".  The size of the label allows Aunt Sadie's to use bigger, more dominant graphics.  Heim Aff. Ex. U; Briggs Depo. at p.11, l.21-p.12, l.4; p.16, ll.4-9.

56. Aunt Sadie's began selling an "Apple Pie" candle in 2001, a "Happy Birthday" candle in 2002, and "It's a Boy" and "It's a Girl" candles in 2003.  Briggs Depo. at p.31, l.16-p.32, l.3; Heim Aff. Exs. T, U.

57. The name "Aunt Sadie's" and the catchphrase "candles in a can" are trademarked.  There is no patent or copyright held on the four Aunt Sadie's candles at issue.  Briggs Depo. at p.46, l.17-p.47, l.9.

14

*"Candles in a Can" Sales*

58. The suggested retail price for most Aunt Sadie's candle designs is $15.  None of the Aunt Sadie's candles at issue accounted for more than 3% of Aunt Sadie's candle sales in any given year.  Briggs Depo. at p.20, l.24-p.21, l.3; Heim Aff. Ex. U.

*The CTS Candle Tins*

59. In 2005, CTS sold 8-ounce candle tins, with decorative labels stating "Happy Birthday to You," "It's a Boy," and "It's a Girl," for $1.99 each.  Laliberte Depo. at p.13, ll.7-9; Heim Aff. Exs. X-Y.

60. The CTS candle tins were made in China, and their labels clearly stated "Made in China," alongside the CTS name and "sleigh" logo.  The CTS candle tin labels also said "Nantucket Distributing."  Laliberte Depo at p.6, ll.10-18; Briggs Depo. at p.62, ll.14-18.

61. The decorative labels for the CTS candles were chosen based on the success of other CTS birthday- and baby-related items, and the art work was then sent to the manufacturer in China. The size of the candle was determined by what was available at the factory in China.  Laliberte Depo. at p.8, ll.11-21; p.11, ll.5-8; p.12, l.18-p.13, l.1.

62. Aunt Sadie's has no knowledge of any intent by CTS to deliberately copy Aunt Sadie's candles.  Briggs Depo. at p.72, ll.5-16.

*Product Comparison*

63. Unlike the CTS candles, the Aunt Sadie's candles are highly scented with fragrances such as apple pie, baby powder, and piña colada.  The strength of the Aunt Sadie's scent and the quality of the Aunt Sadie's wax are superior to that which is used in the CTS candle tins.  The Aunt Sadie's "Happy Birthday" label is decorated with yellow stripes and blue stars, the "Apple Pie" candle has an apple design, and the "It's a Boy" and "It's a Girl" labels are each decorated

with a flower image with a button at the center.  Heim Aff. Ex. T; Briggs Depo. at p.64, l.23-p.65, l.21; Laliberte Depo. at p.10, ll.13-22; C.Bilezikian Depo. at p.30, l.23-p.32, l.19.

64. The CTS candles have no scent, use a lower quality paper label, and the quality of the design is not as good as the Aunt Sadie's Candle.  The CTS "Happy Birthday to You" label is decorated with cupcakes, balloons, confetti, and the words "Make a Wish;" the CTS "It's a Girl" candle sports an image of alphabet blocks; and the CTS "It's a Boy" candle has a baby rattle design.  There is no CTS "Apple Pie" candle.  Heim Aff. Ex. X; Briggs Depo. at p.64, l.23-p.65, l.21; Laliberte Depo. at p.10, ll.13-22; C.Bilezikian Depo. at p.30, l.23-p.32, l.19.

*Aunt Sadie's Customers and Their Reaction to the CTS Candle Tins*

65. Aunt Sadie's customers are keen on scents, and seek out realistic or true-to-life fragrances.  Briggs Depo. at p.26, ll.9-13.

66. Aunt Sadie's received roughly eight or nine phone calls from customers about the CTS candle tins.  Aunt Sadie's recalled that the majority of these conversations were to the effect of: "We see something that looks [like] Aunt Sadie's candles at Christmas Tree Shops."  No Aunt Sadie's customer ever said, "We think Aunt Sadie's is making this [the CTS] candle."  Briggs Depo. at p.56, l.6-p.57, l.24; p.85, ll.15-18.

67. Aunt Sadie's also received a letter from a retail customer, Carol Wright, stating "We are fans of your creative candles and *non-fans* of the Christmas Tree Shop copycat standards…" This customer did not say anything to lead Aunt Sadie's to believe that she was confused about whether Aunt Sadie's was selling its candles to CTS.  Heim Aff. Ex. W; Briggs Depo. at p.59, l.2-p.60, l.12.

68. Aunt Sadie's knows of no Aunt Sadie's customer who actually bought a CTS candle tin. Briggs Depo. at p.58, ll.1-5.

*Aunt Sadie's Advertising and Labeling*

69. The four Aunt Sadie's candles at issue all bear the Aunt Sadie's name somewhere on the label. All Aunt Sadie's candles bear the Aunt Sadie's name somewhere on the label, with the exception of some "private label" candles. Briggs Depo. at p.8,11.19-24; p.10, l.14-p.11, l.7.

70. None of these candles was ever included in Aunt Sadie's advertising or promotion in print. Magazine articles and product features of other Aunt Sadie's candles emphasized the candles' scent and/or local manufacture. Heim Aff. Ex. V ("Aunt Sadie's is a fixture of the South End," "signature smell… Ocean," "bring the outdoors home," "we make our candles right in our shop here… in the South End," "take the beach home with you," "[w]hisk yourself off to an evening in Paris").

## PLAINTIFF SUSAN BOERMAN AND THE "IT'S GREAT TO CREATE" PLAQUES

71. Plaintiff Susan Boerman ("Boerman") wrote <u>It's Great to Create</u>, a book which contains designs for a number of craft items, including two plaques called "Frosty's Snow Cones" and "Autumn Harvest." Amended Complaint ¶14; Heim Aff. Ex. Z.

72. Boerman produced four pages of this book, containing drawings of these two plaques. Heim Aff. Ex. AA. Boerman has produced no other documents in this case.

73. CTS sold its allegedly infringing "fall painted plaque" for $3.99 each in 2003 and 2004, and sold its allegedly infringing "painted Xmas hanger" for $1.99 each in 2003. Heim Aff. Ex. BB.

74. CTS purchased its plaques as-is from a wholesaler's showroom in China. Watts Depo. p.10, l.23-p.11, l.18; p.17, ll.21-23 ("We were in the factory and we were walking around. And I picked the fall design and Christmas design off the shelf . . . It was a ready made product.").

75. The CTS plaques were sold with the CTS label bearing CTS's red "sleigh" logo and stating that the items were "Made in China."  G.Bilezikian Depo. at p. 40, l.22-p.41, l.2.

Respectfully submitted,

**CHRISTMAS TREE SHOPS, INC.**

By its attorneys:

    /s/  Carrie Kei Heim
Peter A. Biagetti, Esq., BBO# 042310
Carrie Kei Heim, Esq., BBO# 652147
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, PC
One Financial Center
Boston, MA  02111
Tel. 617-542-6000
Fax 617-542-2241

Dated: May 15, 2006

LIT 1571291v.4

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

—————————————————————

|  |  |  |
|---|---|---|
| JOHN KNIGHT, DONNA RUSSELL KNIGHT d/b/a THE GLASS EYE GALLERY, CHARLES COLE, VIIU NIILER, COUNTRY GLASS SHOP, AUNT SADIE'S, INC., AND SUSAN BOERMAN, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | **Case No. 04 12698 JLT** |
| v. | ) ) ) | |
| CHRISTMAS TREE SHOPS, INC., | ) ) | |
| Defendant. | ) ) | |

—————————————————————

## <u>PROPOSED EXHIBITS</u>

1.      The "sconce" described at paragraph 20 of the Amended Complaint (hereinafter "Glass Eye Sconce").

2.      The allegedly infringing Christmas Tree Shops, Inc. ("CTS") wall vase.

3.      The "grape plate" described at paragraph 21 of the Amended Complaint (hereinafter "Country Glass Sun Catcher").

4.      The allegedly infringing CTS "basket plate hanger."

5.      A drawing and photo of the Glass Eye sconce, produced by Plaintiffs John Knight and Donna Russell Knight d/b/a The Glass Eye Gallery (collectively "Glass Eye") in response to CTS's requests for production of documents.

6.      Sales numbers for the Glass Eye Sconce produced by Glass Eye in response to CTS's requests for production of documents.

7.      Glass Eye Gallery advertising produced by Glass Eye in response to CTS's requests for production of documents.

8.      The Glass Eye logo and product labels produced by Glass Eye in response to CTS's requests for production of documents.

9.      Sales records for the allegedly infringing CTS "wall vase," kept by CTS in the usual course of its business and produced by CTS in response to Plaintiffs' requests for production of documents.

10.     Photo of the Country Glass Sun Catcher, produced by Plaintiffs Charles Cole, Viiu Niiler and  Country Glass Shop (collectively "Country Glass") in response to CTS's requests for production of documents.

11.     Sales numbers for the Country Glass Sun Catcher produced by Country Glass in response to CTS's requests for production of documents.

12.     Museum of Fine Arts catalog pages containing images of Country Glass products produced by Country Glass in response to CTS's requests for production of documents.

13.     The Country Glass logo and product labels produced by Country Glass in response to CTS's requests for production of documents.

14.     Photos of the allegedly infringing CTS "basket plate hanger," kept by CTS in the usual course of its business and produced by CTS in response to Plaintiffs' requests for production of documents.

15.     Sales records for the allegedly infringing CTS "basket plate hanger," kept by CTS in the usual course of its business and produced by CTS in response to Plaintiffs' requests for production of documents.

16.     Sales numbers for the Aunt Sadie's Apple Pie, Happy Birthday, It's a Boy and It's a Girl Candles produced by Aunt Sadie's in response to CTS's requests for production of documents.

17.     Aunt Sadie's magazine promotions produced by Aunt Sadie's in response to CTS's requests for production of documents.

18.     A letter from Aunt Sadie's co-owner Gary Briggs to CTS, and attached letter from an Aunt Sadie's customer, sent to CTS prior to litigation, kept by CTS in the ordinary course of business, and produced by CTS in response to Plaintiffs' requests for production of documents.

19.     The label designs for the allegedly infringing CTS "candle tins," kept by CTS in the usual course of its business and produced by CTS in response to Plaintiffs' requests for production of documents.

20.     Sales records for the CTS candle tins, kept by CTS in the usual course of its business and produced by CTS in response to Plaintiffs' requests for production of documents.

21.     A CTS advertising flyer, kept by CTS in the usual course of its business and produced by CTS in response to Plaintiffs' requests for production of documents.

22.     CTS price labels, representative of those attached to the allegedly infringing CTS products.

23.     Copies of the thirty (30) survey responses received from plaintiffs.

24.     Copy of the "Report of Survey of Glass Eye Customers."